**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Oluwole OLOYEDE, Defendant– Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Clifford C. COOPER, Defendant– Appellant.**

Nos. 91–5833, 91–5850.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1992.

Decided Nov. 24, 1992.

As Amended Jan. 13, 1993.

Harry Levy, Schulman, Treem, Kaminkow & Gilden, P.A., Baltimore, MD, argued (Robert B. Schulman, Andrew H. Levine, on brief), for defendant-appellant Cooper.

James Clyde Clark, Land, Clark, Carroll & Mendelson, P.C., Alexandria, VA, argued, for defendant-appellant Oloyede.

Jeanne Marie Gardes, Office of the U.S. Atty., Alexandria, VA, argued (Richard Cullen, U.S. Atty., Robinson Nottingham, Renee R. Christina, Sp. Asst. U.S. Attys., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge,
CHAPMAN, Senior Circuit Judge, and
MICHAEL, United States District Judge
for the Western District of Virginia, sitting
by designation.

## OPINION

PER CURIAM:

Appellants Clifford C. Cooper and Oluwole Oloyede were convicted of a scheme to defraud the United States Immigration and Naturalization Service ("INS") by falsifying documents for citizenship applications of Nigerians and Ethiopians. Appellants raise a number of issues on appeal. However, we find it necessary to consider only two questions: whether 8 U.S.C. § 1324(a)(1)(D), which proscribes harboring of aliens, encompasses activities directed solely to illegal aliens already living in this country, and whether the evidence obtained in a search of Cooper's office should have been suppressed because the search warrant either was overly broad in scope or violative of the attorney-client privilege. We affirm the convictions.

Regarding the statutory question, appellants contend that this is a purely legal question of statutory construction requiring *de novo* review under *United States v. Burroughs*, 564 F.2d 1111, 1119 (4th Cir. 1977). The government argues that the applicable standard is the familiar one,

"[w]hether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir.1982). However, the court agrees with appellants that the scope of the statute, not sufficiency of the evidence, is at issue and that this is a legal question requiring *de novo* review.

## I.

Appellant Cooper was an immigration lawyer in Arlington, Virginia whose practice consisted of representing Nigerians and Ethiopians in various immigration actions before INS. Appellant Oloyede, a Nigerian national, was a part-time cab driver who also ran the "Towers Network," a Washington, D.C. organization which assisted Nigerian aliens. Oloyede sold false employment, social security and other supporting documents to illegal aliens and referred the aliens to Cooper for preparation of their INS applications.

Eight of Cooper's clients, all illegal aliens, were arrested for submitting fraudulent documents in support of their citizenship applications. Testifying against appellants at trial, the illegal aliens stated that they had come to the United States as students or had arrived on visitor visas, or without permission. Each had failed to return home after graduation or upon expiration of his or her visa.

Five of the witnesses came to the United States to attend school. Rasheed Apapa, studying for his Ph.D. in theology at Southeastern University, had resided in the United States continuously since September 7, 1986. Yussuf Gbadamosi attended Montgomery College and Howard University, from which he obtained a Bachelor of Science Degree in Microbiology. He graduated from the College of Pharmacy in 1981 and was attending graduate school at Southeastern University for a Masters Degree in Business Administration. His student work permit expired in 1987 and he needed a permanent resident status so that he could use his pharmacy license to practice in Maryland. Both Benjamin Fawehin-

mi and Donald Ngundam attended Howard University and both became registered pharmacists in the District of Columbia after graduation. Asimiyu Momo attended school in this country and married an American. Momo lost his passport and needed a residency permit to travel to Nigeria to visit his parents.

The other three witnesses came to the United States to find work. Abideen Lamedi arrived as a visitor from the United Kingdom in 1989 and settled in Raleigh, North Carolina, where he held two jobs. Surat Animashaun came to the United States May 11, 1989, and was working illegally. Emmanuel Babatunde lived with his brother in New Jersey and had worked there since June 13, 1989. Although they spoke English with heavy accents, the testimony of these eight witnesses poignantly expressed their urgent need of legal status.

The evidence at trial showed a distinct pattern of appellants luring well-educated, employed aliens to Cooper's office by offering to sell them a legal status they could not otherwise obtain. The aliens paid appellants between $1,600 and $3,500 for a completed fraudulent immigration application. Cooper accompanied these aliens to the immigration hearings, using his authority as an attorney to guide and counsel them through the process.

## II.

Appellants were convicted under 8 U.S.C. § 1324(a)(1)(D) which states, in pertinent part:

> Any person who encourages an alien to reside in the United States, knowing or in reckless disregard of the fact that such residence is or will be in violation of law, shall be fined in accordance with Title 18, or imprisoned not more than five years, or both, for each alien in respect to whom any violation of this paragraph occurs.

This section was added by the Immigration Reform and Control Act of 1986 ("IRCA"). The parties agree that there are no reported cases in which this statute has been used to convict someone who assisted aliens already living in the United States.

■ The starting point of our analysis is the statute itself; the language of the statute controls where it is not ambiguous or unconstitutional. *United States v. Luskin,* 926 F.2d 372, 376 (4th Cir.1991); *see also Touche Ross & Co. v. Reddington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979).

■ Appellants maintain that Section 1324(a)(1)(D) is solely directed to acts bringing aliens into the country. However, the plain language states, "knowing that [the illegal alien's] residence *is* or will be in violation of the law." (Emphasis supplied). Because the use of the verb "is" clearly connotes the present status of the illegal aliens' residence in this case within the United States, it can only be understood to apply expressly to actions directed towards illegal aliens already in this country.

■ In addition, the statute applies to "any person." Thus, appellants' argument that IRCA was intended to apply only to employers must fall. Congress intended to give broad scope to the class of persons whose conduct is proscribed by the statute.

Lastly, appellants argue that their conduct merely assisted aliens in avoiding detection of an illegal status and did not rise to the level of "encourag[ing] an alien to reside in the United States." In the absence of any controlling authority, the district court turned to Black's Law Dictionary which defines "encourage" to include actions taken to embolden or make confident, and concluded that appellants' actions permitted illegal aliens to be more confident that they could continue to reside with impunity in this country. The district court also found that by selling false citizenship papers, appellants helped those aliens to reside in this country by providing them with an opportunity to gain employment, support themselves, and avoid having to return to their native lands. "While offering them a chance to stand equally with all other American citizens, defendants encouraged them to continue to reside here." Joint Appendix at 318.

We arrive at the same conclusion on a somewhat different basis. The word "en-

courage" does not appear elsewhere in IRCA; hence, the statute as a whole does not assist with its definition. However, the development of the conduct proscribed by this section may be traced from the language of the predecessor statute to the language in the current law to arrive at a clear understanding of the meaning of "encourage" in § 1324(a)(1)(D). Subsection (a) of the former § 1324 stated, in pertinent part:

> Any person who willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of any alien not lawfully entitled to enter or reside within the United States, shall be guilty of a felony.

Criminal sanction in the predecessor statute extended only to bringing aliens into the country.

■■■■ IRCA revised this statutory scheme by extending its reach to additional specific conduct. Currently, § 1324(a)(1) subsection (A) proscribes bringing an alien into the country, subsection (B) prohibits transporting an illegal alien within the United States; subsection (C) forbids concealing, harboring or shielding an alien from detection; and subsection (D) bars encouraging aliens either to come into the country or to reside in this country once they are here. Thus, IRCA worked a substantial expansion in the types of activities held criminal under this statute. IRCA's plain language distinguishes between these distinct categories of behavior and indicates that "encouraging" is not limited to bringing in, transporting or concealing illegal aliens. Rather, "encouraging" relates to actions taken to convince the illegal alien to come to this country or to stay in this country. Appellants' actions reassured their clients that they could continue to work in the United States, that they would not be subject to the threat of imminent detection and deportation, and that they could travel back to their homeland without risk of being prevented from returning, thus providing all of the benefits of citizenship. The selling of fraudulent documents and immigration papers under these cir-

cumstances constitutes "encourages" as that word is used in the statute.

■■■■ In addition, the language "knowing or in reckless disregard of the fact that such residence is or will be in violation ..." means that guilty knowledge is a material element of this offense. *Bland v. United States,* 299 F.2d 105, 108 (5th Cir.1962). In this case, the evidence was overwhelming that appellants knew that each of these aliens was illegally residing in this country. When aliens testified that they pointed out to Cooper incorrect information in their papers such as a false age, letters from employers for whom the aliens had never worked, and other "errors," Cooper told them that fabrication was necessary in order to win approval of their INS applications. Cooper knowingly instructed his clients to memorize the fictitious information because they would have to testify to it during the INS examination hearing. Thus, the plain language of the statute supports appellants' conviction for assisting aliens living within the United States.

### III.

This interpretation of the language of the statute is confirmed by an analysis of the legislative history of IRCA. The predecessor statute to IRCA was the Immigration and Nationality Act of 1952 (INA). The general purpose of INA was to prevent aliens from illegally entering or remaining in the United States, *United States v. Washington,* 471 F.2d 402, 404 (5th Cir. 1973), and that purpose encompassed appellants' actions in this case. IRCA was drafted to "control illegal immigration to the U.S., make limited changes in the system for legal immigration, and provide a controlled legalization program for certain undocumented aliens who have entered this country prior to 1982." H.R.Rep. No. 99–682(I), 99th Cong., 2nd Sess., U.S.Code Cong. & Admin.News 1986, 5649. ICRA corrected abuse by many groups, including foreign students and illegal workers. With respect to foreign students,

> ... the Committee has placed restrictions on the ability of these students to remain

in the United States and seek lawful permanent resident alien status.

*Id.* at 5654; and, with respect to illegal workers,

Employers will be deterred by the penalties in this legislation from hiring unauthorized aliens and this, in turn, will deter aliens from entering illegally or violating their status in search of employment.

*Id.* at 5650. IRCA mandated procedures to detect and deport these particular classes of illegal immigrants by imposing severe sanctions on employers who hired illegal aliens and by making public assistance unavailable to illegal aliens. The net effect of IRCA was to put illegal aliens to a serious choice of either obtaining legal status or leaving this country. We find appellants' scheme to be exactly the type of encouragement the statute was aimed at preventing, confirming its applicability to persons living in the United States.

## IV.

Nevertheless, Cooper argues that his conviction should be reversed because the district court failed to suppress evidence seized in the search of his office pursuant to an overly broad search warrant. The warrant permitted seizure of all of Cooper's files rather than being specifically limited to an area of suspected illegal activity. Cooper claims that the affidavit supporting the search warrant related solely to suspected fraud in citizenship applications of Cooper's Nigerian clients and that the search warrant should have been limited to this group of files. Moreover, Cooper disputes that the search could be justified under the "permeated with fraud" doctrine. Finally, Cooper believes that the search of his office unlawfully impinged upon the attorney-client privilege by invading the privacy of each of his clients.

The Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a "general, exploratory rummaging." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). This requirement ensures that the search is confined in scope to particularly described evidence relating to a specific crime for which there is probable cause. *Voss v. Bergsgaard,* 774 F.2d 402, 404 (10th Cir.1985). The sufficiency of a search warrant and its supporting affidavit is reviewed *de novo* to determine whether a "substantial basis" exists for the magistrate judge's decision. *United States v. Hodges,* 705 F.2d 106, 108 (4th Cir.1983). Yet, a determination of probable cause by a neutral and detached magistrate judge is entitled to substantial deference. *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). The Fourth Circuit has held that courts should not suppress evidence seized pursuant to a warrant because of "hypertechnical errors." *United States v. Jacob,* 657 F.2d 49, 52 (4th Cir.1981).

The search warrant in this case was supported by an affidavit of Melody Jackson, Special Agent for INS, which may be summarized as follows: 1) An Immigration Supervisory Examiner had noticed that over fifty cases in which Nigerian citizens were applying for permanent residence status under § 249 of the Immigration and Nationality Act contained similar documentation and identical employer information. 2) A confidential informant disclosed that Cooper and Oloyede supplied fraudulent documentation in connection with his or her § 249 application and described in great detail how Cooper and Oloyede operated in a fraudulent manner. The informant noted that Cooper had a sign on his door saying he was an Immigration Specialist. 3) A second confidential informant corroborated the first informant's description of how Cooper and Oloyede operated by reporting a similar experience. 4) Agent Jackson reviewed 26 files submitted under § 249 by Nigerian aliens who were represented by Cooper. Each of these files contained false documents.

Cooper contends that the government should have either limited its search to the files reviewed by Agent Jackson which were allegedly part of the scheme or narrowed the search to § 249 applicants who were Nigerians. Cooper maintains that

there was nothing contained in the affidavit, nor was any showing ever made, that Cooper's law practice consisted exclusively of processing § 249 applications on behalf of Nigerian citizens. Yet, on the basis of that contention alone, the Government was given free rein, through an overbroad warrant, to rummage through and seize every file in Mr. Cooper's office.

Brief of Appellants at 21.

Cooper relies on *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955 (3rd Cir. 1984), in which an attorney, Charles Klitzman, was suspected of defrauding insurance companies by submitting fraudulent medical reports and inflated medical bills in personal injury cases. The government seized his files relating to personal injury cases but also seized files concerning matters unrelated to personal injury, as well as files of other attorneys, even though only Klitzman and one employee of the firm were under suspicion. *Id.* at 961. The district court ruled that the search was overbroad because the warrants allowed the seizure of all of the firm's financial records, file lists, and appointment books regardless of whether those documents were connected in any way to the personal injury files sought by the grand jury. *Id.* at 960. Documents and files were seized irrespective of their relationship to the alleged conspiracy and financial information was seized that could not be regarded as necessary or relevant to proving the alleged scheme. *Id.* at 958. Thus, the court found the search overbroad because it included distinct severable portions that were unrelated to the suspected criminal activity.

However, there were no such severable portions in Cooper's practice. While Klitzman's practice involved many matters outside the suspected personal injury area, Cooper's practice concerned immigration matters to such an extent that non-immigration matters, if any, would be a *de minimis* portion of his activities. From information in the affidavit, the magistrate judge had probable cause to believe that these immigration matters were pervasively fraudulent because the suspected criminal activity identified in the affidavit was pertinent to all immigration matters in this case.

For example, while the magistrate judge in *Klitzman* would not expect Klitzman to employ fraudulent medical forms in real estate matters, he could reasonably infer that Cooper employed fraudulent immigration applications for his Ethiopian clients as well as his Nigerian clients and that he prepared fraudulent work permit applications as well as fraudulent citizenship applications, all being basically dependent on the same sort of supporting documentation.

Moreover, the types of documents specified in the warrant were limited to those having some relation to the suspected criminal activity. The warrant specified the seizure of counterfeit government documents, INS forms, work authorization cards and other such documents. It also specified biographical information or data on individuals other than Cooper, Oloyede or Shoyoye (an unindicted coconspirator), customer lists, ledgers, books of accounts, bank records indicating deposits, cash receipt books and disbursement records, all of which would relate to the fraudulent immigration activity under suspicion. The warrant also permitted the seizure of record-keeping devices and material and equipment related to the manufacture and sale of counterfeit documents. The warrant did not encompass the records of any other attorneys. Accordingly, we conclude that it was reasonable for the magistrate judge to determine that there was no portion of Cooper's practice unrelated to the suspected criminal activity.

■ The government seeks to justify the seizure of all of Cooper's business and client records based on a determination that Cooper's practice was "permeated with fraud." A number of courts have found that warrants permitting seizure of all records are appropriate where the business is "permeated with fraud." *United States v. Bentley*, 825 F.2d 1104, 1110 (7th Cir.1987); *United States v. Kail*, 804 F.2d 441, 445 (8th Cir.1986); *United States v. Sawyer*, 799 F.2d 1494, 1508 (11th Cir.

1986). For example, in *United States v. Brien*, 617 F.2d 299, 308 (1st Cir.1980), the court found that the facts warranted a "strong belief that [defendant's] operation was, solely and entirely, a scheme to defraud." Under those circumstances, the court held that a valid warrant could issue authorizing the seizure of all materials the magistrate judge had probable cause to believe were evidence of that scheme. *Id.* at 307.

Cooper nonetheless argues that an affidavit alleging fraud in only a part of the business may not be used to justify a conclusion that the business is "permeated with fraud." He relies on *United States v. Stubbs*, 873 F.2d 210 (9th Cir.1989), where the district court suppressed the evidence obtained in a search it termed overbroad because the affidavit failed "to provide probable cause for a reasonable belief that tax evasion permeated Stubb's entire real estate business. Instead, the affidavit details certain aspects of the operation which were used to evade taxes." In that case, the search warrant did not provide any standard by which an executing officer could determine what to seize, even though the IRS knew from former employees what the documents subject to seizure looked like and where to find them. The court of appeals affirmed, believing that the warrant should have been more specific.

The *Stubbs* reasoning flows from a fact-based determination by the court that the affidavit failed to provide sufficient facts upon which the magistrate judge could find probable cause that the business was permeated with fraud. In *United States v. Burke*, 718 F.Supp. 1130, 1140 (S.D.N.Y. 1989), the court wrestled with the evidence required to support probable cause in this situation and held that

> It is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud. Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are "just the tip of the iceberg." That evidence could consist of a large

number of fraudulent transactions or of documentation ... that the entire operation is a scam.

*Citing United States v. Brien*, 617 F.2d 299, 308 (1st Cir.1980).

In this case, the magistrate judge had probable cause to believe that Cooper's entire practice was permeated with fraud. Documentation in over 50 cases alerted INS to the problem, two confidential informants outlined in great detail the procedures associated with appellants' operation, and a review of 26 files disclosed that each file contained fraudulent documents. Thus, *Stubbs* is inapposite.

■  Notwithstanding the evidence that his office was "permeated with fraud," Cooper argues that the court must find the warrant overly broad because the government failed to make a written finding to that effect prior to seeking the search warrant. Cooper relies on the holding in *Center Art Galleries—Hawaii, Inc. v. United States*, 875 F.2d 747 (9th Cir.1989), where defendant's business consisted of sales of works of art, 20% of which were created by Salvador Dali and 80% by other artists. The government had recited 22 instances of alleged misrepresentations regarding the work of Dali without mentioning any other aspects of the business. The court held that because the affidavit supporting the warrants "did not aver that evidence of Dali fraud was inseparable from other [defendant] documents or that [defendant's business] was permeated with fraud," the warrants were overbroad. *Id.* at 751. The court noted that the government must make this required showing *in obtaining* the search warrant. *Id.* (*citing United States v. Washington*, 797 F.2d 1461, 1473 (9th Cir.1986)). We find the argument here in support of this *ex ante* formal requirement to be unreasonably "hypertechnical." The evidence in this case clearly supported the magistrate judge's implicit finding that Cooper's office was "permeated with fraud." Reversing Cooper's conviction for the government's failure to state affirmatively in its affidavit that his office was "permeated with fraud" would violate our

holding that courts should not suppress evidence seized because of "hypertechnical errors."

The Fourth Circuit has not previously addressed the question of whether all records may be seized if there is probable cause to believe that the business is "permeated with fraud." Severability of legitimate documents from suspected fraudulent documents remains a pertinent question, even where a broad seizure is permitted. The government may not seize legitimate files even when it has evidence of an extensive fraud scheme in one particular area of the business. *United States v. Roche*, 614 F.2d 6, 7 (1st Cir.1980). Relevance of materials subject to seizure in a search warrant to an alleged crime stated in the supporting affidavit is the pivotal factor. *Voss v. Bergsgaard*, 774 F.2d 402, 406 (10th Cir.1985). We hold that where there is probable cause to believe that a business is "permeated with fraud," either explicitly stated in the supporting affidavit or implicit from the evidence therein set forth, a warrant may authorize the seizure of all documents relating to the suspected criminal area but may not authorize the seizure of any severable portion of such documents relating to legitimate activities.

Lastly, Cooper maintains that the search of his office unlawfully impinged on the attorney/client privilege between Cooper and his clients. The Fourth Circuit Court of Appeals has held that

> The attorney-client privilege as traditionally recognized at common law and as now incorporated in the Federal Rules of Evidence, controls in all federal judicial proceedings. However, since the privilege "impedes [the] full and free discovery of the truth," and is "in derogation of the public's right to every man's evidence," it is not "favored" by federal courts. *Herbert v. Lando*, 441 U.S. 153, 175 [99 S.Ct. 1635, 1648, 60 L.Ed.2d 115] (1979). Accordingly the privilege is to be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3rd Cir. 1979). Consonant with this policy, the privilege applies only when the person claiming the privilege has as a client consulted an attorney for the purpose of securing a legal opinion or services and not "for the purpose of committing a crime or tort" and in connection with that consultation has communicated information which was intended to be kept confidential.

*In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir.1984). Assuming that Cooper has standing to claim the privilege for his clients, we determine under the specific facts of this case that the attorney/client privilege was waived. The information communicated by the clients to Cooper was specifically intended to be used to file their citizenship applications with the INS. As held in *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982),

> Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege. Any voluntary disclosure (such as an offering brochure or income tax returns) by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter.

Thus, there was no intention on the part of Cooper's clients that their communications be kept strictly confidential. The *Jones* court held that it is of the essence of the privilege that it is limited to those communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended. Since we find that the privilege was waived by a lack of intent to keep the communications confidential, we do not address the alternative rationale that the privilege would be waived because both the attorney and his clients were engaged in criminal behavior.

For the reasons stated, the appellants' convictions are

AFFIRMED.