PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

WILLIAM ELIOT HURWITZ,
        *Defendant-Appellant.*

AMERICAN ACADEMY OF PAIN
MEDICINE; THE ASSOCIATION OF
AMERICAN PHYSICIANS & SURGEONS;
THE AMERICAN PAIN FOUNDATION;
THE NATIONAL PAIN FOUNDATION;
THE NATIONAL FOUNDATION FOR THE
TREATMENT OF PAIN; NATIONAL
ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS; RUSSELL K. PORTENOY;
RICHARD PAYNE; PEGGY COMPTON;
CELESTE JOHNSON; ROBERT
TWILLMAN; WILLIAM L. MARCUS,
        *Amici Supporting Appellant.*

No. 05-4474

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonard D. Wexler, Senior District Judge, sitting by designation.
(CR-03-467)

Argued: March 17, 2006

Decided: August 22, 2006

Before WIDENER and TRAXLER, Circuit Judges,
and Cameron McGowan CURRIE, United States District Judge for
the District of South Carolina, sitting by designation.

Vacated and remanded by published opinion. Judge Traxler wrote the majority opinion, in which Judge Currie joined. Judge Widener wrote a concurring and dissenting opinion.

## COUNSEL

**ARGUED:** Lawrence S. Robbins, ROBBINS, RUSSELL, ENG-LERT, ORSECK & UNTEREINER, L.L.P., Washington, D.C., for Appellant. Richard Daniel Cooke, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Donald J. Russell, Damon W. Taaffe, ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER, L.L.P., Washington, D.C., for Appellant. Paul J. McNulty, United States Attorney, Gene Rossi, Assistant United States Attorney, Mark D. Lytle, Assistant United States Attorney, Alexandria, Virginia, for Appellee. Jack R. Bierig, SIDLEY AUSTIN BROWN & WOOD, L.L.P., Chicago, Illinois; Eamon P. Joyce, SIDLEY AUSTIN BROWN & WOOD, L.L.P., Washington, D.C., for Amicus Curiae, American Academy of Pain Medicine, Supporting Appellant. Andrew L. Schlafly, Far Hills, New Jersey, for Amicus Curiae, The Association of American Physicians & Surgeons, Supporting Appellant. Samuel Rosenthal, CURTIS, MALLET-PREVOST, COLT & MOSLE, L.L.P., Washington, D.C., for Amici Curiae, The American Pain Foundation, The National Pain Foundation, and The National Foundation for the Treatment of Pain, Supporting Appellant. Joshua L. Dratel, Co-Chair, NACDL, Amicus Committee, New York, New York; Robert P. Marcovitch, Atlanta, Georgia, for Amicus Curiae, National Association of Criminal Defense Lawyers, Supporting Appellant. David T. Goldberg, New York, New York; Sean H. Donahue, Washington, D.C., for Amici Curiae, Russell K. Portenoy, Richard Payne, Peggy Compton, Celeste Johnston, Robert Twillman, and William L. Marcus, Supporting Appellant.

**OPINION**

TRAXLER, Circuit Judge:

A jury convicted Dr. William E. Hurwitz of multiple counts of drug trafficking for prescribing narcotic pain medicine in violation of 21 U.S.C.A. §§ 841(a)(1) and 846 (West 1999). Hurwitz appeals, arguing, *inter alia*, that the district court improperly admitted evidence recovered in a search of his office and incorrectly instructed the jury on the law. Although we affirm the district court's decision to admit the evidence seized in the search, we conclude that the district court did not properly instruct the jury on the controlling law. Accordingly, we vacate Hurwitz's convictions and remand for a new trial.

I.

Hurwitz is a medical doctor who operated a practice in McLean, Virginia, dedicated to the treatment of patients suffering from pain. Hurwitz's approach to pain management involved the use of opioids, including methadone, oxycodone (typically Oxycontin, a brand-name version of a time-release form of oxycodone), and hydromorphone (usually the brand-name Dilaudid). Many of Hurwitz's patients were on a protocol that used very high doses of opioids to control their pain.

Hurwitz came to the attention of federal authorities in 2002, after several of his patients were arrested for attempting to sell illicit and prescription drugs. The patients identified Hurwitz as the source of their prescription drugs, and they began cooperating with the investigators. The information these patients provided eventually led to Hurwitz's indictment on numerous drug-related charges — one count of conspiracy to engage in drug trafficking, *see* 21 U.S.C.A. § 846; one count of engaging in a continuing criminal enterprise, *see* 21 U.S.C.A. § 848 (West 1999); two counts of healthcare fraud, *see* 18 U.S.C.A. § 1347 (West 2000); and 58 counts of drug trafficking, including two counts each of drug-trafficking resulting in serious bodily injury and drug-trafficking resulting in death, *see* 21 U.S.C.A. § 841(a)(1).

The government's evidence at trial painted a picture of a doctor who operated well outside the boundaries of usual medical practice. The government contended that Hurwitz was little more than a common drug dealer who operated out of a medical office rather than on a street corner. The government's expert witnesses testified that a doctor who knowingly prescribed opioids to an addict or to a patient the doctor knew was selling the drugs on the street was acting outside the bounds of legitimate medical practice, and the government presented compelling evidence suggesting that Hurwitz did just that — continued to prescribe large quantities of opioids to patients that he knew were selling the drugs or abusing them (for example, by injecting drugs that were directed to be taken orally).

Several of the patients who were cooperating with the authorities tape-recorded their appointments with Hurwitz. In one recording, Hurwitz indicated that it was "not inconceivable" to him that some patients were "selling part of their medicines so they could buy the rest." S.A. 101. In another recording Hurwitz stated, "so I have kind of a huge conspiracy of silence because I, in fact, even, even knowing what I'll call the suspicious nature of you guys, assumed that you weren't stupid enough to — to not protect my practice and preserve your own . . . access to medications." S.A. 104. Hurwitz told another patient to get an x-ray or an MRI "for the files to cover our butts." J.A. 3089.

The government presented evidence of what seemed to be extraordinarily high doses of opioids prescribed by Hurwitz. An expert witness for the government testified that high-dose opioid therapy typically involved doses of the equivalent of approximately 195 milligrams of morphine a day, although there had been a study involving doses of 350 milligrams a day and another involving doses of up to two grams a day. J.A. 2456.

The doses prescribed by Hurwitz, however, vastly exceeded those quantities. Hurwitz often wrote prescriptions calling for a patient to take thirty 80-milligram Oxycontins per day. For Hurwitz's patients in the high-dose program, a prescribed opioid dosage of 100 pills per day was not uncommon. Hurwitz testified that between 1998 and 2002, the median daily dosage for his patients was approximately 2000 milligrams (2 grams) of morphine or its equivalent. (Because

Oxycontin is stronger than morphine, Hurwitz testified that 2000 milligrams of morphine would translate to about 1000 milligrams of Oxycontin.) Between July 1999 and October 2002, Hurwitz prescribed to one patient a total of more than 500,000 pills, which amounted to more than 400 pills per day. Towards the end of the time that Hurwitz treated the patient, the prescribed dosage included 1,600 5-milligram Roxicodones (a non-timed release version of Oxycontin) per day.[1] Still another patient was prescribed 10,000 Roxicodones as a one-month supply. Patients with limited visible sources of income spent tens of thousands of dollars a month on narcotics prescribed by Hurwitz.

The government also presented evidence showing that Hurwitz had previously been disciplined for improper prescribing practices. In 1992, the District of Columbia Board of Medicine had reprimanded Hurwitz and placed him on probation for prescribing drugs when not authorized to do so and for failing to conform to the prevailing standards of acceptable medical practice. In 1996, the Virginia Board of Medicine revoked his license upon finding that he had prescribed excessive amounts of controlled substances. The Virginia Board also required Hurwitz to attend classes on proper prescription practices and how to detect when patients were trying to use him as a source for prescription drugs rather than a doctor to treat pain.

Not surprisingly, the defense painted an entirely different picture. Hurwitz and his witnesses contended that the high-dose protocol was a proper medical procedure for treating patients with intractable pain. They testified that the body quickly develops resistance to the dangerous side-effects of opioids (such as respiratory depression), which then permits an escalation of the dosage until pain relief is obtained. One expert testified that once a patient becomes tolerant of the side-effects, there is effectively "no ceiling" on the quantity of opioids that can be prescribed if necessary to control pain. J.A. 3975. That expert also testified that many patients over time will require an increase in their opioid dosage in order to maintain control of their pain. Hurwitz's experts also testified that there is no medical reason to stop treating a patient for pain simply because that patient may be abusing

---

[1] At trial, Hurwitz contended that the 1,600 pills per day dosage was the product of a clerical error.

illicit drugs and that, in some cases, stopping such treatment may even be more problematic.

Hurwitz testified about his practices and the patients he treated. He discussed how patients were generally asked to fill out questionnaires and submit medical records before receiving treatment and how he often included patients' family members during visits as a part of his approach to treating pain. Hurwitz participated in an e-mail discussion group with other professionals about how to approach various situations in pain treatment, and he would confer with other physicians concerning the treatment of certain patients. Hurwitz also discussed how he based his pain-management approach on what he learned at pain management conferences and what he understood other doctors would do.

Some of Hurwitz's patients testified on his behalf, explaining that Hurwitz was the only physician who had managed to relieve their debilitating pain. Molly Shaw, for example, discussed her futile attempts to treat what the Mayo Clinic had diagnosed as neuropathic pain, a pain so severe that it forced her to retire at age 47 and remain almost completely bedridden. She testified that Hurwitz's treatments allowed her to regain her life and live in considerably less pain. The patients' testimony, as well as the testimony of Hurwitz's staff, portrayed Hurwitz as a caring physician whose sole focus was providing pain relief for his patients.

Hurwitz was convicted of one count of drug trafficking conspiracy, one count of drug trafficking resulting in death, two counts of drug trafficking resulting in serious bodily injury, and forty-six counts of drug trafficking. The jury acquitted Hurwitz of six counts of drug trafficking, as well as one count of engaging in a continuing criminal enterprise and two counts of healthcare fraud. The jury failed to reach a decision on the remaining drug trafficking counts. The district court sentenced Hurwitz to 25 years in prison. This appeal followed.

## II.

We first consider Hurwitz's claims that the district court erroneously denied his motion to suppress the evidence recovered from the search of his office. Before we address the substance of Hurwitz's

suppression claims, however, a review of some background facts is necessary.

### A.

As mentioned above, federal authorities began monitoring Hurwitz's practice in 2002, after several of Hurwitz's patients were arrested on drug charges. On the basis of the information obtained during the investigation, federal authorities obtained search warrants for Hurwitz's home and office.[2]

In support of its warrant application, the government relied on the affidavit of Agent Fulton S. Lucas, a Task Force Officer with the Drug Enforcement Administration's High Intensity Drug Trafficking Group for Northern Virginia. Agent Lucas's supporting affidavit explained that the investigation of Hurwitz stemmed from reports by local law enforcement agencies of "an unusually high incident of arrests of individuals for distributing prescription narcotics in the Northern and Southwest region of the state of Virginia, and rural areas of West Virginia and Tennessee." J.A. 78. According to Agent Lucas, "[a] significant number of these arrests resulted in the cooperation of individuals who revealed that the source of their prescription narcotics was Dr. William E. Hurwitz of McLean, Virginia." J.A. 78. The affidavit provided details about the investigation of Hurwitz, including evidence obtained with the assistance of five of Hurwitz's patients.

Agent Lucas submitted the standard federal warrant application form, which prompts the applicant to "describe the person or property to be seized." J.A. 73. Agent Lucas's description provided as follows: "See Attachment A of Affidavit," referring to his supporting affidavit. J.A. 73. In turn, Attachment A (the "Attachment") listed specific items the government sought permission to seize "related to Dr. Hurwitz'[s] medical practice which constitute evidence [of drug trafficking]" including "[p]atient medical and billing files." J.A. 94. The Attachment did not identify any individual patient files.

---

[2]Hurwitz does not challenge the legality of the warrant authorizing the search of his residence.

The magistrate judge granted the application, granted the government's motion to seal the application and accompanying affidavit, and issued a search warrant for Hurwitz's medical practice.[3] On the face of the warrant — in the space reserved for a description of the items to be seized — the words "See Attachment" had been entered. The search warrant indicated that Agent Lucas's affidavit established probable cause to seize the property described in the reserved space on the search warrant. The government executed the search warrant, seizing all of Hurwitz's patient files.

B.

Hurwitz challenges the validity of the search warrant on two grounds. He contends that the search warrant was invalid because it failed to identify the items to be seized with sufficient particularity, and that the search warrant was fatally overbroad. We review a district court's disposition of a motion to suppress *de novo*. *See United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir.), *cert. denied*, 544 U.S. 1067 (2005).

(1)

The Fourth Amendment instructs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The requirement that a search warrant describe with particularity the items to be seized ensures that a citizen is not subjected to "a general, exploratory rummaging in [his personal] belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). Significantly, the particularity requirement applies to the warrant, as opposed to the application or the supporting affidavit submitted by the applicant. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004); *see also Owens ex rel. Owens v. Lott*, 372 F.3d 267, 274 (4th Cir. 2004). Thus, "[t]he fact that the *application* adequately described

---

[3]The magistrate judge found that "revealing the material sought to be sealed would jeopardize an ongoing criminal investigation" and therefore concluded that the "application[] for the search warrant[], [and] the affidavit in support of the . . . search warrant[]" should be sealed. J.A. 98.

the 'things to be seized' does not save the *warrant* from its facial invalidity." *Groh*, 540 U.S. at 557.

Hurwitz first argues that the search warrant was invalid because it failed to particularly identify the property to be seized. The search warrant did not, on its face, describe any of the property to be seized; instead, it simply referred to the Attachment to Lucas's affidavit that was submitted with the application for the search warrant. Hurwitz claims that the executing officers carried the warrant at the time of the search but not the Attachment or the affidavit, both of which were sealed. Hurwitz argues that because the Attachment did not accompany the warrant at the time of the search, the particulars contained in the Attachment cannot be construed to be part of the search warrant.[4]

The particularity requirement of the Fourth Amendment may be satisfied by cross-reference in the warrant to separate documents that identify the property in sufficient detail. *See Groh*, 540 U.S. at 557 ("We do not say that the Fourth Amendment forbids a warrant from cross-referencing other documents. Indeed, most Courts of Appeals have held that [cross-referencing is permissible under certain circumstances]."); *United States v. Washington*, 852 F.2d 803, 805 (4th Cir. 1988). As a general rule, a supporting affidavit or document may be read together with (and considered part of) a warrant that otherwise lacks sufficient particularity "if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Groh*, 540 U.S. at 557-58. Although the search warrant in this case does not on its face describe the items to be seized in the search

---

[4]Hurwitz fails to identify facts in the record supporting his contention that the Attachment did not accompany the search warrant at the time of the search. Before the district court, counsel for Hurwitz simply asserted that the Attachment was not presented during the search, but it is unclear how counsel came by these facts, as there was no testimony or evidence presented regarding who was present during the search. By the same token, however, the government did not challenge this assertion. On appeal, the parties have now submitted factual support for their positions. Because this information was not before the lower court, we will not consider it on appeal. And in view of the government's failure to dispute this factual assertion in district court, we will assume that the Attachment to the Lucas affidavit did not, in fact, accompany the search warrant at the time Hurwitz's office was searched.

of Hurwitz's office, it does refer to the "Attachment" to Lucas's supporting affidavit detailing the property to be seized.

Hurwitz contends that the mere reference to the Attachment to Lucas's affidavit was insufficient, on its own, to satisfy the Fourth Amendment's particularity requirement. According to Hurwitz, the Attachment itself must have accompanied the warrant at the time of the search for it to be construed to supply the particulars lacked by the search warrant. Hurwitz bases his argument on the language of *Groh* suggesting that the majority of the Courts of Appeals permit a general warrant to be cured by reference to a separate document only if *both* requirements — that words of incorporation be used and that the incorporated document accompany the warrant — are met. *See id.* Thus, Hurwitz reads *Groh* as establishing a definitive two-part rule for validating a warrant by incorporation of a separate document.

*Groh*, however, establishes no such rule. Instead, *Groh* simply acknowledges the approach generally followed by the Courts of Appeals. Because neither requirement was satisfied in *Groh*, the Supreme Court declined to further consider the question of incorporation by reference. *See id.* at 558 ("But in this case the warrant did not incorporate other documents by reference, nor did either the affidavit or the application (which had been placed under seal) accompany the warrant. Hence, we need not further explore the matter of incorporation.")

We recognize that a majority of our sister Circuit Courts of Appeals appear to require the satisfaction of both conditions before allowing a separate document to be read as part of the search warrant. *See Bartholomew v. Pennsylvania*, 221 F.3d 425, 428-29 (3rd Cir. 2000); *United States v. McGrew*, 122 F.3d 847, 849-50 (9th Cir. 1997); *United States v. Dahlman*, 13 F.3d 1391, 1395 (10th Cir. 1993); *United States v. Dale*, 991 F.2d 819, 846-47 (D.C. Cir. 1993) (per curiam); *United States v. Morris*, 977 F.2d 677, 681 n.3 (1st Cir. 1992); *United States v. Curry*, 911 F.2d 72, 77 (8th Cir. 1990). In this circuit, however, it is sufficient *either* for the warrant to incorporate the supporting document by reference *or* for the supporting document to be attached to the warrant itself. *See Washington*, 852 F.2d at 805 (concluding that warrant was sufficiently particular where the warrant completely failed to refer to the supporting affidavit listing items to

be seized but the affidavit was attached, and explaining that "[a]n affidavit may provide the necessary particularity for a warrant if it is *either* incorporated into *or* attached to the warrant") (emphasis added) (internal quotation marks omitted). At least one other circuit subscribes to this view. *See Baranski v. Fifteen Unknown ATF Agents*, 452 F.3d 433 (6th Cir. 2006) (en banc).

In this case, the search warrant cross-references the Attachment to Lucas's supporting affidavit. Although the words of incorporation used in the warrant are not overly precise, Hurwitz does not contend that they are insufficient to incorporate the Attachment for purposes of the particularity requirement.[5] Moreover, Hurwitz does not dispute that the Attachment itself identifies the items to be seized from Hurwitz's office with sufficient particularity. Thus, we need not explore either of these issues at length. We conclude that the search warrant properly cross-referenced the Attachment which, in turn, supplied the requisite particularity to the search warrant, regardless of whether the Attachment accompanied or was appended to the search warrant at the time it was executed.

Hurwitz maintains that because the Attachment did not accompany the warrant when the search was performed, the essential purposes of the Fourth Amendment's particularity requirement went unfulfilled. A sufficiently particular warrant not only guards against general searches, but also "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States v. Chadwick*, 433 U.S. 1, 9 (1977). Moreover, according to Hurwitz, requiring the Attachment to accompany the search warrant at the time of the search would also inform the executing officer of the limits of his discretion to search. *See McGrew*, 122 F.3d at 850.

---

[5]In both his opening and reply briefs, Hurwitz's challenge to the validity of the warrant is premised on the contention that the Attachment to the Lucas affidavit did not accompany the warrant. *See* Brief of Appellant at 16 ("As in *Groh*, the sealed affidavit did not accompany the warrant at the time of the search . . . On this ground alone, the evidence should have been suppressed."); Reply Brief at 6 ("Our argument, however, is that Attachment A did not accompany the warrant when it was executed by the officers, [and] thus could not *limit* the scope of the search and afford the *opportunity* for service on Dr. Hurwitz.").

These policy aims, as important as they may be, do not reflect a constitutional mandate that an executing officer possess or exhibit the affidavit or any other document incorporated into the warrant at the time of the search *in order for the warrant to be valid*. The Fourth Amendment does not require an officer to serve a search warrant before executing it. *See Groh*, 540 U.S. at 562 n.5. In fact, the Fourth Amendment is not offended where the executing officer fails to leave a copy of the search warrant with the property owner following the search, *see United States v. Simons*, 206 F.3d 392, 403 (4th Cir. 2000), or fails even to carry the warrant during the search, *see Mazuz v. Maryland*, 442 F.3d 217, 229 (4th Cir. 2006).[6] "[T]he requirement of particular description does not protect an interest in monitoring searches" or "engag[ing] the police in a debate" about the warrant. *United States v. Grubbs*, 126 S. Ct. 1494, 1501 (2006). Rather, "[t]he Constitution protects property owners . . . by interposing, *ex ante*, the deliberate, impartial judgment of a judicial officer" and "by providing, *ex post*, a right to suppress evidence improperly obtained." *Id.* (internal quotation marks omitted). These protections are sufficient to ensure that the officer's search is properly limited and to provide assurance to the property owner that the executing officer enjoys the lawful authority to search for specific items. Indeed, Hurwitz was able to examine Agent Lucas's affidavit and its attachment and raise a full and complete challenge to the validity of the warrant after the search. We see nothing in the Constitution requiring that an officer possess or exhibit, at the time of the search, documents incorporated into a warrant as an additional safeguard for the particularity requirement. *See Baranski*, 452 F.3d at 443. Accordingly, the district court did not err by rejecting Hurwitz's claim that the absence of the Attachment at the time of the search rendered the warrant invalid.

---

[6]Of course, the failure to leave a copy of the warrant might violate Rule 41 of the Federal Rules of Criminal Procedure. Suppression, however, would depend upon whether the party seeking suppression suffered prejudice or the government intentionally violated the rule. *See Simons*, 206 F.3d at 403. These questions are not before us, however, because Hurwitz does not contend that suppression is required under Rule 41.

(2)

Hurwitz also challenges the breadth of the warrant. When executing the warrant, the officers seized *all* of the patient files in Hurwitz's office. On appeal, Hurwitz contends that there was no probable cause to justify the seizure of the files of every patient.

The Fourth Amendment requires that a warrant be "no broader than the probable cause on which it is based." *United States v. Zimmerman*, 277 F.3d 426, 432 (3rd Cir. 2002) (internal quotation marks omitted). "Although the concept of probable cause resists an exacting definition, it 'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found' in a particular place." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). An assessment of probable cause by an impartial magistrate judge must take into account "the totality of the circumstances," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), including hearsay information, *see United States v. Dequasie*, 373 F.3d 509, 518 (4th Cir. 2004), as set forth in the affidavit presented in support of the warrant.

When reviewing a magistrate judge's probable cause determination, we look to whether there was "a substantial basis for the decision." *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit" should accord "great deference" to the magistrate's determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted).

The Attachment to the supporting affidavit, which we read as part of the search warrant, identified specific "items to be seized," including "Patient medical and billing files" and all related records and documents, including "complete medical files." J.A. 94. Hurwitz argues that because the supporting affidavit was based on statements of only five of Hurwitz's numerous patients, there was insufficient probable cause for the government to seize all of the files. We disagree.

There is no requirement that the government have evidence relating to each and every patient of Hurwitz to support the seizure of all of the files in this case:

> [W]here there is probable cause to believe that a business is "permeated with fraud," either explicitly stated in the supporting affidavit or implicit from the evidence therein set forth, a warrant may authorize the seizure of all documents relating to the suspected criminal area but may not authorize the seizure of any severable portion of such documents relating to legitimate activities.

*United States v. Oloyede*, 982 F.2d 133, 141 (4th Cir. 1992) (internal quotation marks omitted).

In *Oloyede*, we affirmed the conviction of a lawyer who was involved in a scheme to defraud the government by falsifying immigration papers. Like Hurwitz, the lawyer in *Oloyede* challenged the scope of a search that seized all of his clients' files, claiming that the government should have limited the search to files reviewed by the agent who testified in support of the warrant or to files involving similar immigration applications. We rejected this argument, holding that the seizure of all of the files was justified by probable cause that the business was "permeated with fraud." *Id.* The question in this case, then, is whether a substantial basis existed for the issuing judge to find probable cause that Hurwitz's medical practice was permeated with his drug trafficking activity such that all of his patient files could be seized.

Agent Lucas indicated in his affidavit that he discovered "an unusually high incident of arrests of individuals for distributing prescription narcotics" in certain regions in Virginia, West Virginia, and Tennessee, and that "[a] significant number of these arrests" resulted in the identification of Hurwitz as the source of the prescription drugs. J.A. 78. He then recounted evidence suggesting that Hurwitz commonly performed only the most cursory examinations — if he performed them at all — prior to prescribing heavy doses of controlled substances. According to Agent Lucas, Hurwitz had a reputation in the drug community for his practice of prescribing high amounts of narcotics, and one cooperating source claimed to have become a patient for that very reason. Additionally, Agent Lucas indicated that Hurwitz demanded $1,000 "initiation fees" from patients, as well as $250 monthly "maintenance fees," to be paid in cash, suggesting that Hurwitz made a common practice of fronting drugs rather than prac-

ticing medicine. According to the supporting affidavit, Hurwitz's activities as a mere drug dispenser followed a well-established pattern in that Hurwitz's license to practice medicine was suspended in Virginia in 1996 for over-prescribing controlled substances to "at least" 26 patients, and that the District of Columbia Board of Medicine likewise suspended his license for similar reasons in 1992.

Additionally, the Lucas affidavit included facts suggesting that Hurwitz apparently understood that his patients, on a wide-spread basis, were re-selling and distributing the controlled substances that he prescribed to them in the first instance. Hurwitz purportedly told one patient "something to the effect that all of his patients were being arrested" and "that he had patients in other states who were being arrested." J.A. 85-86.

Agent Lucas's affidavit provided a substantial basis for the magistrate judge to find probable cause that Hurwitz's practice was permeated with the illegal distribution of drugs. *See Oloyede*, 982 F.2d at 141. The evidence of Hurwitz's common practice gave reason to believe that he "consistently departed from accepted professional standards" and "was not practicing medicine, but was instead cloaking drug deals under the guise of a professional medical practice." *United States v. Alerre*, 430 F.3d 681, 691 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1925 (2006). Accordingly, we find no reversible error in the district court's decision to admit the evidence seized in the search of Hurwitz's office.

### III.

We turn now to Hurwitz's challenges to the jury instructions with regard to the charges he faced under 21 U.S.C.A. § 841. "The decision to give or not to give a jury instruction is reviewed for an abuse of discretion." *United States v. Moye*, ___ F.3d ___, ___ 2006 WL 2045802, *5 (4th Cir. July 24, 2006) (en banc). "We review a jury instruction to determine whether, taken as a whole, the instruction fairly states the controlling law. By definition, a court abuses its discretion when it makes an error of law." *Id.* (citation and internal quotation marks omitted).

Section 841 provides that, "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to . . . distribute, or dispense, or possess with intent to . . . distribute, or dispense, a controlled substance." 21 U.S.C.A. § 841(a)(1). Doctors who are "registered" by the Attorney General are authorized to write prescriptions for or to otherwise dispense controlled substances, so long as they comply with the requirements of their registration. *See* 21 U.S.C.A. § 822(b) (West 1999) (authorizing those "registered by the Attorney General" to "possess, manufacture, distribute, or dispense [controlled substances] to the extent authorized by their registration and in conformity with the other provisions of this subchapter.").

As authorized by the Controlled Substances Act, *see* 21 U.S.C.A. § 821 (West Supp. 2006), the Attorney General has promulgated regulations addressing the conditions under which registrants are authorized to dispense controlled substances. The regulations provide that a prescription for a controlled substance is effective only if it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a) (2006). The regulation further provides that:

> An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly . . . issuing [such a purported prescription] shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

*Id.*

Synthesizing the requirements of the relevant statutes and regulations, we have held that to convict a doctor for violating § 841, the government must prove: (1) "that the defendant distributed or dispensed a controlled substance"; (2) that the defendant "acted knowingly and intentionally"; and (3) "that the defendant's actions were not for legitimate medical purposes in the usual course of his professional medical practice or were beyond the bounds of medical practice." *United States v. Singh*, 54 F.3d 1182, 1187 (4th Cir. 1995)

(internal quotation marks and alteration omitted); *see also Alerre*, 430 F.3d at 689-90; *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993); *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1141 (4th Cir. 1994).[7]

On appeal, Hurwitz raises several objections to the district court's instructions to the jury. He argues that the instructions required the jury to apply the knowledge requirement only to Hurwitz's act of writing a prescription, and that the instructions therefore permitted the jury to convict even if it concluded that Hurwitz did not know that any given prescription was not for a legitimate medical purpose or was beyond the bounds of medical practice. Hurwitz claims that the instructions thus improperly limited the statute's *mens rea* requirement and permitted the jury to convict him of a serious crime with little more than a finding of negligence. And in a related argument, Hurwitz contends that the district court erred by not including a good-faith instruction in connection with the § 841 charges and by specifically instructing the jury that it could not consider Hurwitz's good faith as to any of the drug-trafficking charges. Hurwitz also argues that the district court erred by not defining the phrases "beyond the bounds of medical practice" or "not for a legitimate medical purpose." As we explain below, we conclude that a new trial is required because of the district court's error regarding the good-faith instruction. Given this conclusion, we need not consider and we express no opinion on Hurwitz's other challenges to the jury instructions.

A.

Hurwitz first contends that the district court erred by rejecting his request for a "good faith" instruction. Hurwitz argues that his good faith in issuing the challenged prescriptions was relevant to his intent when treating his patients and thus relevant to the jury's determina-

---

[7]Other circuits have concluded that whether the defendant's actions were for legitimate medical purposes or were beyond the bounds of medical practice is not an essential element of a § 841 charge against a doctor. *See, e.g.*, *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc); *United States v. Polan*, 970 F.2d 1280, 1282 (3d Cir. 1992); *United States v. Seelig*, 622 F.2d 207, 211-12 (6th Cir. 1980).

tion of whether he acted outside the bounds of accepted medical practice or without a legitimate medical purpose.

The district court agreed with the government's position that Hurwitz's good faith was legally irrelevant to the drug-trafficking charges, and the court declined to include Hurwitz's requested instruction. However, as to the two healthcare fraud charges, the district court agreed to give a good-faith instruction. As to those counts, the district court instructed the jury that it could not convict Dr. Hurwitz if he "acted in good faith in dispensing any of the prescriptions alleged to constitute the crime of healthcare fraud." J.A. 4909. The court defined "good faith" to mean "good intentions in the honest exercise of best professional judgment as to a patient's needs. It means the doctor acted according to what he believed to be proper medical practice." J.A. 4909. The district court instructed the jury that "good faith applies only" to the healthcare fraud counts. J.A. 4909. Thus, the district court not only declined to give a good-faith instruction with regard to the drug counts, but also informed the jury that it *could not* consider good faith when deciding whether to convict Hurwitz of drug trafficking under § 841.[8]

(1)

As an initial premise, we agree with Hurwitz that a doctor's good faith generally is relevant to a jury's determination of whether the doctor acted outside the bounds of medical practice or with a legitimate medical purpose when prescribing narcotics.

In *United States v. Moore*, 423 U.S. 122 (1975), the seminal case addressing the prosecution of physicians under § 841, the Supreme Court concluded that "registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice." *Id.* at 124. In the course of concluding that the evidence was sufficient to support the jury's conclusion that the defendant acted beyond the bounds of professional practice, the Court noted two good-faith instructions that had been given to the jury. The district court had instructed the jury that the defendant could be con-

---

[8]The jury acquitted Hurwitz of the healthcare fraud charges.

victed if the jury found that he knowingly distributed controlled substances "other than in good faith for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." *Id.* at 139, and that the defendant "could not be convicted if he merely made 'an honest effort' to prescribe . . . in compliance with an accepted standard of medical practice." *Id.* at 142 n.20.

Building on the Supreme Court's approach in *Moore*, lower courts have concluded that when resolving the ultimate question in a § 841 prosecution against a doctor — whether the doctor acted without a legitimate medical purpose or beyond the bounds of accepted medical practice — some latitude must be given to doctors trying to determine the current boundaries of acceptable medical practice. Thus, courts have consistently concluded that it is proper to instruct juries that a doctor should not be held criminally liable if the doctor acted in good faith when treating his patients. *See Alerre*, 430 F.3d at 692 (noting that "the jury was correctly instructed on the applicable legal principles," and that the jury was instructed that the defendant-doctors "could not be convicted if they had dispensed the controlled substances at issue 'in good faith'"); *United States v. Hughes*, 895 F.2d 1135, 1141-42 (6th Cir. 1990) (citing *Moore*'s standard that physicians cannot be convicted if they "dispens[e] controlled substances in the course of professional practice" and explaining that "[b]ecause Dudley was a licensed physician, the jury could not find him guilty of distributing controlled substances, as long as he acted in 'good faith'"); *United States v. Vamos*, 797 F.2d 1146, 1151 (2d Cir. 1986) ("[T]he doctor must act in the good faith belief that his distribution of the controlled substance is for a legitimate medical purpose and in accordance with the usual course of generally accepted medical practice."); *United States v. Hayes*, 794 F.2d 1348, 1351-52 (9th Cir. 1986) (finding no error in charge that required jury to determine that physician acted other than in good faith and defined good faith as "an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country"); *United States v. Norris*, 780 F.2d 1207, 1209 n.2 (5th Cir. 1986) (finding proper district court's instruction to the jury that "[a] controlled substance is prescribed by a physician in the usual course of a professional practice, and, therefore, lawfully, if the substance is prescribed by him in good faith, medically treating a patient

in accordance with a standard of medical practice generally recognized and accepted in the United States"); *United States v. Carroll*, 518 F.2d 187, 189 (6th Cir. 1975) (reversing conviction because trial court "did not advise [the jury] that physicians are exempt from the provisions of the drug abuse statute when they dispense or prescribe controlled substances in good faith to patients in the regular course of professional practice"). Accordingly, the district court erred by concluding that good faith is not relevant when a registered physician is charged with violating § 841.

(2)

The question we must next consider is Hurwitz's argument that the district court erred by refusing his proffered good-faith charge. While the government objected below to any suggestion that a good-faith instruction was appropriate, the government on appeal does not contend that a good-faith instruction is never warranted in a case where a registered physician is prosecuted under § 841. Instead, the government argues that Hurwitz is not entitled to reversal on this point because the good-faith instruction Hurwitz offered below was an incorrect statement of the law. *See United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995) ("A district court's refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.") (internal quotation marks omitted). We agree with the government that the good-faith instruction offered by Hurwitz was not an accurate statement of the law.

The good-faith instruction offered by Hurwitz at trial stated that:

> If a doctor dispenses a drug in good faith to medically treat a patient, then the doctor has dispensed the drug for a legitimate medical purpose and in the course of medical practice. That is, he has dispensed the drug lawfully. "Good faith" in this context means good intentions in the honest exercise of best professional judgment as to a patient's needs. It means

the doctor acted according to what *he believed to be proper medical practice*.

J.A. 719 (emphasis added). This proposed instruction clearly sets forth a subjective standard, permitting Hurwitz to decide for himself what constitutes proper medical treatment. As the government contends, however, allowing criminal liability to turn on whether the defendant-doctor complied with his own idiosyncratic view of proper medical practices is inconsistent with the Supreme Court's decision in *Moore*.

In *Moore*, the Supreme Court discussed the circumstances under which doctors could be prosecuted under § 841 using language that strongly suggests the inquiry is an objective one. For example, the Court held that "registered physicians can be prosecuted under § 841 when their activities fall outside the *usual course of professional practice*." *Moore*, 423 U.S. at 124 (emphasis added). The Court also noted that, when passing the Controlled Substances Act, Congress intended to "confine authorized medical practice within *accepted limits*," *id.* at 142 (emphasis added), and that "physicians who go beyond *approved practice* remain subject to serious criminal penalties." *Id.* at 144 (emphasis added). And as discussed above, the Supreme Court when concluding that the evidence was sufficient to support the defendant's conviction noted two good-faith instructions that had been given to the jury. Those instructions clearly set forth an objective standard. *See id.* at 138-39, 142 n.20.

The good-faith instructions used in other circuits likewise have reflected an objective standard for determining whether the defendant acted in good faith. *See Hayes*, 794 F.2d at 1351 (affirming conviction where district court instructed that "[g]ood faith is not merely a doctor's sincere intention towards the people who come to see him, but, rather, it involves his sincerity in attempting to conduct himself in accordance with a standard of medical practice generally recognized and accepted in the country"); *Norris*, 780 F.2d at 1209 (rejecting argument that good-faith instruction should reflect subjective rather than objective standard); *United States v. Voorhies*, 663 F.2d 30, 34 (6th Cir. 1981) (affirming conviction where jury was instructed that: "Good faith . . . means good intentions and honest exercise of best professional judgment as to a patient's medical needs. It connotes

an observance of conduct in accordance with what the physician should reasonably believe to be proper medical practice.").

Hurwitz, however, contends that his proffered good-faith instruction was proper because it was derived from our opinion in *United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994). In that case, the defendant argued, *inter alia*, that the district "court and the prosecution used a medical malpractice standard rather than a criminal standard to judge his actions." *Id.* at 1137. In the course of addressing the defendant's arguments, we reviewed the jury instructions given by the district court and concluded that the instructions correctly set forth a criminal standard of liability. *See id.*

The jury instructions in *Tran Trong Cuong* included the following language:

> [If a] doctor dispenses a drug in good faith in medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of medical practice. That is, he has dispensed the drug lawfully. Good faith in this context means good intentions in the honest exercise of best professional judgment as to a patient's need. It means the doctor acted in accordance with what he believed to be proper medical practice.

*Id.* at 1138. This charge is essentially identical to the good-faith instruction proffered by Hurwitz. Since we described the instructions in *Tran Trong Cuong* as correctly establishing a criminal standard of liability, Hurwitz argues that we approved of the good-faith portion of those instructions. We disagree.

No issue was raised by the defendant in *Tran Trong Cuong* that required us to consider the precise contours of a good-faith instruction. Instead, the only challenge to the jury instructions was the defendant's claim that the instructions set forth a civil rather than criminal liability standard. We found no merit to that argument and concluded that the instructions correctly set forth a criminal standard. *See id.* at 1137. However, we specifically noted that the district court's instructions on the no-legitimate-medical-purpose element "appear to be more strict than that required by *Moore* and therefore was to defen-

dant's benefit." *Id.* at 1138. The good-faith instruction was part of the instructions on the no-legitimate-medical-purpose element and thus was part of the instructions that we believed were more favorable to the defendant than required by *Moore*. Because in *Tran Trong Cuong* we were not called on to consider the defendant's good faith and because we explained that the portion of the instructions that included the good-faith instructions were broader than necessary to comply with *Moore*, it simply cannot be said that in *Tran Trong Cuong* we *approved* the good-faith instruction sought by Hurwitz.

In this case, however, we are squarely presented with the question of whether, in a § 841 prosecution against a doctor, the inquiry into the doctor's good faith in treating his patients is a subjective or objective one. We believe that the inquiry must be an objective one, a conclusion that has been reached by every court to specifically consider the question. As the Second Circuit explained,

> "[P]rofessional practice" [as used in 21 C.F.R. § 1306.04(a)] refers to generally accepted medical practice; a practitioner is not free deliberately to disregard prevailing standards of treatment. . . .
>
> . . . .
>
> To permit a practitioner to substitute his or her views of what is good medical practice for standards generally recognized and accepted in the United States would be to weaken the enforcement of our drug laws in a critical area.

*Vamos*, 797 F.2d at 1151, 1153; *see also United States v. Williams*, 445 F.3d 1302, 1309 (11th Cir. 2006) ("Williams's proposed instruction fails to introduce any objective standard by which a physician's prescribing behavior can be judged. Under Williams's proposed instruction, if it is a physician's subjective belief that he is meeting a patient's medical needs by prescribing that patient a controlled substance, then that physician cannot be convicted of violating the Controlled Substances Act even if he acts outside all accepted standards of medical practice. Thus, the proposed instruction is contrary to *Moore*."); *Norris*, 780 F.2d at 1209 (rejecting defendant's claim "that a standard medical practice may be based on an entirely subjective

standard" because "[o]ne person's treatment methods do not alone constitute a medical practice"); 3 Leonard B. Sand et al., *Modern Federal Jury Instructions*, Instruction 56-19, comment (2003) ("Every court to examine the issue has held that the objective standard that the doctor acted in accordance with what he *reasonably* believed to be proper medical practice should apply.").

Because the instruction proffered by Hurwitz set forth a subjective standard for measuring his good faith, the instruction was not a correct statement of the law. Accordingly, although we conclude that good faith generally is relevant in a § 841 case against a registered physician, we nonetheless conclude that the district court did not err by refusing the particular charge sought by Hurwitz. *See Lewis*, 53 F.3d at 32.

## B.

Though the district court did not err by refusing Hurwitz's good-faith charge, there remains a separate issue regarding the court's good-faith instructions. As mentioned above, the district court gave a good-faith instruction with regard to the healthcare fraud charges and then specifically instructed the jury that good faith was relevant *only* to the fraud charges. As we have explained, however, a doctor's good faith in treating his patients is relevant to the jury's determination of whether the doctor acted beyond the bounds of legitimate medical practice.

The government contends that because Hurwitz's proposed instruction was not a correct statement of the law, any errors in the district court's good-faith instructions cannot justify a new trial. We disagree. The government's argument confuses two separate issues — whether the district court erred by refusing to use the good-faith charge proposed by Hurwitz, and whether the district court erred by affirmatively informing the jury that good faith was relevant only to the fraud charges. Hurwitz timely objected to that instruction, thus preserving that error of commission as a separate issue for review on appeal. The district court's incorrect instruction on good faith is not insulated from review on appeal simply because Hurwitz's proposed good-faith instruction was incorrect.

The government also contends that any error with regard to the good-faith instruction is harmless, because a good-faith instruction was not warranted in this case.[9] *See Moye*, ___ F.3d at ___, 2006 WL 2045802 at *6 ("In general, an error in a jury instruction will warrant reversal of the conviction only if the error is prejudicial based on a review of the record as a whole.") (internal quotation marks omitted).

The government first suggests that any error is harmless because Hurwitz's attorney admitted during closing argument that Hurwitz's actions were beyond the bounds of accepted medical practice. The government argues that this admission is binding on Hurwitz and amounts to a concession that the jury could not reasonably have concluded that Hurwitz acted in good faith. *See United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986) (concluding that "a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party"); *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984) (explaining the general rule that "statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney, a proposition which extends to arguments to a jury") (citation, internal quotation marks, and alteration omitted). We disagree.

---

[9]While the government argues that any error in the instructions was harmless, it also takes the position that Hurwitz's appellate arguments should be reviewed for plain error only. According to the government, Hurwitz on appeal has changed the nature of his argument regarding good faith to such an extent that plain-error review is warranted. In making this argument, the government again fails to distinguish between the separate claims of error raised by Hurwitz — whether the district court erred by rejecting Hurwitz's proffered instruction and whether the district court erred by affirmatively instructing the jury that good faith was not relevant to the § 841 charges. As to this separate error of commission, Hurwitz argues on appeal just what he argued below — that it was error for the court to instruct the jury that good faith was not relevant to the § 841 charges. Hurwitz timely objected to that instruction, *see* J.A. 4836-37, and he renewed the objection after the instructions were actually given by referring to the objections previously made. *See* J.A. 4924. That is enough to preserve the issue for appeal, *see Jones v. United States*, 527 U.S. 373, 388 (1999), and plain-error review thus is not applicable.

Although counsel stated that Hurwitz "did practice outside the bounds of medicine," J.A. 4787, the statement referred to Hurwitz's dealings with various state medical boards. Given counsel's statement that the medical boards "were back in the Stone Age," J.A. 4787, the statement could be understood as meaning only that Hurwitz in the past acted outside the bounds of what *those boards* believed to be proper medical practice. That Hurwitz practiced outside the bounds of an out-of-step medical board's view of proper medical practices does not necessarily mean that his actions were beyond the bounds of *generally accepted* medical practices. The attorney's statement therefore cannot be viewed as a clear and unambiguous admission that Hurwitz knowingly acted outside the bounds of accepted medical practice. *See Blood*, 806 F.2d at 1221.

A more difficult question, however, is presented by the government's contention that the evidence presented at trial so overwhelmingly demonstrated that Hurwitz was acting well beyond the bounds of accepted medical practice that the jury could not reasonably have found that he acted in good faith. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); *United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990) ("No instruction may be given unless there is a foundation in the evidence to support it.") (internal quotation marks omitted). Under the government's view, then, any error in the instructions was necessarily harmless, because Hurwitz was not entitled to a good-faith instruction under the evidence presented at trial.

While the government's evidence was powerful and strongly indicative of a doctor acting outside the bounds of accepted medical practice, we cannot say that no reasonable juror could have concluded that Hurwitz's conduct fell within an objectively-defined good-faith standard. Hurwitz presented expert testimony showing that it was proper to use opioids when treating addicts who suffered from pain. Hurwitz's experts testified that his high-dose opioid therapy was a medically appropriate way to treat intractable pain and that the quantities of opioids he prescribed were appropriate. Even as to the patients whose dosages appeared extraordinarily high, such as the patient who was prescribed over 500,000 pills during the course of his treatment,

the record contains expert testimony showing that Hurwitz's treatment and the quantities of opioids prescribed was medically proper. In addition, the testimony of Hurwitz and his staff indicated that he ran a legitimate medical practice, requiring patients to submit medical records and questionnaires before visits, conferring with other physicians outside of his practice about proper procedures, and relying on information from professional conferences when determining proper treatment practices. Thus, the record reveals a sufficient evidentiary basis for a good-faith instruction.

Good faith was at the heart of Hurwitz's defense. Hurwitz did not dispute the bulk of the government's factual evidence — that is, he did not argue that he did not prescribe the narcotics that were the basis for the charges against him. Instead, Hurwitz argued that the manner in which he used narcotics to treat chronic and debilitating pain was a medically proper approach to a difficult medical issue. By concluding that good faith was not applicable to the § 841 charges and affirmatively instructing the jury that good faith was not relevant to those charges, the district court effectively deprived the jury of the opportunity to consider Hurwitz's defense. Thus, while we recognize that the government's evidence was strong, we simply cannot conclude that the district court's error in removing good faith from the jury's consideration was harmless.

Accordingly, we conclude that Hurwitz was prejudiced by the district court's error in instructing the jury that Hurwitz's good faith was relevant only to the fraud charges. *See Moye*, ___ F.3d at ___, 2006 WL 2045802 at *6 ("In general, an error in a jury instruction will warrant reversal of the conviction only if the error is prejudicial based on a review of the record as a whole.") (internal quotation marks omitted); *Carroll*, 518 F.2d at 189 (reversing conviction because trial court "did not advise [the jury] that physicians are exempt from the provisions of the drug abuse statute when they dispense or prescribe controlled substances in good faith to patients in the regular course of professional practice"); *cf. Voorhies*, 663 F.2d at 33 (finding no error in jury charge which, "taken as a whole, . . . was calculated to protect any physician who made a good faith effort to comply with the law").

## C.

To summarize, we conclude that good faith is relevant to § 841 charges against a registered physician and that the district court erred

by incorrectly instructing the jury that Hurwitz's good faith was relevant only to the healthcare fraud charges. This error in the court's instructions to the jury cannot be considered harmless, and a new trial is therefore required. On remand, the district court shall include a good-faith instruction (if requested by Hurwitz and if supported by the evidence presented at re-trial), but that instruction must reflect an objective rather than subjective standard for measuring Hurwitz's good faith.

## IV.

Accordingly, for the foregoing reasons, we vacate Hurwitz's convictions under 21 U.S.C.A. §§ 841 and 846,[10] and we remand for a new trial in accordance with this opinion.[11]

*VACATED AND REMANDED*

WIDENER, Circuit Judge, concurring and dissenting:

I concur in the result and in all of the opinion of the court except its discussion of good faith. I do not believe good faith should be objective; the two terms are contradictory, it seems to me.

I would approve the instruction this very court discussed approvingly in *Tran Trong Cuong*, 18 F.3d 1132, 1138 (4th Cir. 1994), slip

---

[10]The instructions on the § 846 conspiracy count mirrored those for the substantive § 841 counts, by requiring a determination that Hurwitz entered into an agreement to distribute controlled substances not for a legitimate medical purpose or beyond the bounds of medical practice. Thus, the error in connection with the good-faith instruction affects the conviction on the conspiracy count to the same extent as it does the § 841 convictions.

[11]On appeal, Hurwitz also challenges certain evidentiary rulings by the district court and the district court's decision to excuse a juror after deliberations began. Because we have concluded that a new trial is required, the juror-dismissal issue is moot and we decline to address it. We also decline to consider Hurwitz's evidentiary challenges. Should those issues arise again on remand, the district court is free to consider the admissibility questions *de novo*.

22-23, and note that some or all of the instructions mentioned approvingly in the majority opinion, and based on good faith, do not mention objectivity as the standard. For example, see the two instructions in *Moore*, 423 U.S. 122, 138-39, 142 n.20, (1975) and the instruction from *Voorhies*, 663 F.2d 30, 34 (1981) in the Sixth Circuit.

In such cases as here, the act in question is not in dispute, it is the intent of the actor into which inquiry is made.