**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 19-4761**

───────────────

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

     v.

JOEL A. SMITHERS, a/k/a Joel A Smithers,

          Defendant - Appellant.

───────────────

Appeal from the United States District Court for the Western District of Virginia, at Abingdon.  James P. Jones, Senior District Judge.  (1:17-cr-00027-JPJ-PMS-1)

───────────────

Submitted:  October 27, 2023                    Decided:  February 2, 2024

───────────────

Before GREGORY, RICHARDSON, and BENJAMIN, Circuit Judges.

───────────────

Vacated and remanded by published opinion.  Judge Gregory wrote the opinion, in which Judge Richardson and Judge Benjamin joined.

───────────────

**ARGUED**:  Beau B. Brindley, THE LAW OFFICES OF BEAU B. BRINDLEY, Chicago, Illinois, for Appellant.  S. Cagle Juhan, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.  **ON BRIEF**: Neal Lawrence Walters, SCOTT KRONER, PLC, Charlottesville, Virginia; Blair T. Westover, THE LAW OFFICES OF BEAU B. BRINDLEY, Chicago, Illinois, for Appellant.  Daniel P. Bubar, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

───────────────

GREGORY, Circuit Judge:

Joel Smithers, until this prosecution a doctor of osteopathy, was convicted on 861 counts, all related to his opioid-prescription practices. He was sentenced to a total of 480 months in prison. After his conviction, the Supreme Court in *Ruan v. United States*, 597 U.S. 450 (2022), clarified the *mens rea* required to convict someone of unauthorized dispensing or distributing of a controlled substance. Because *Ruan* makes clear that Smithers' jury instructions misstated the law, and because the misstatements were not harmless error, we vacate the convictions and remand to the district court for a new trial. We do not reach Smithers' Confrontation Clause, sufficiency-of-the-evidence, or withdrawal-of-counsel challenges.

I.

On September 12, 2017, a grand jury indicted Joel Smithers on one count of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). J.A. 101. Over the course of the next year, the government filed two superseding indictments. The first added 715 counts: one count of maintaining a place for the purpose of unlawful distribution, in violation of 21 U.S.C. § 856, and 714 counts of unlawful dispensing and distributing of a controlled substance. J.A. 102–03. The second superseding indictment added 146 counts of unlawful dispensing and distributing. J.A. 130–31. The latter counts were charged under 21 U.S.C. § 841(a)(1), which (in addition to criminalizing possession with intent to dispense or distribute) provides that, "[e]xcept as authorized . . . , it [is] unlawful for any person knowingly or intentionally . . . to manufacture,

2

distribute, or dispense . . . a controlled substance." The statute does not define "authorized." Instead, Drug Enforcement Agency regulations define it: a prescription is only authorized when "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04.

Because of the government's superseding indictments, the district court granted Defendant's two motions to continue the trial and moved the trial to April 29, 2019. J.A. 157A. On March 18, 2019, defense counsel moved for a third continuance. J.A. 158. He said the government had provided him with multiple CDs, containing over 4,000 pages of discovery, just three days before, and that he did not have time to review the evidence before trial. J.A. 158. On March 22, the magistrate judge held a hearing on the motion. J.A. 161–92. The government said that a former AUSA had received the documents in December 2018, but had retired soon after, and the documents likely "got lost in the shuffle." J.A. 171. According to the government, roughly half of the documents in the CDs had been produced to the defendant earlier in the case. J.A. 193. The magistrate judge denied Smithers' motion to continue but ruled that the government would not be allowed to use at trial any document or information it provided to defense counsel for the first time on March 15, 2019. J.A. 194.

After one more motion to continue, one motion by defense counsel to withdraw, and one motion for reconsideration of the denial of the motion to withdraw, J.A. 203, 212–13, 214, 215W, 215Z, 215AA—all of them unsuccessful and none of them material to the disposition of this case—the trial began on April 29, 2019. J.A. 216–17.

3

II.

A.

The government presented eighteen witnesses at trial. Two were expert witnesses, eight were patients, and eight were miscellaneous lay witnesses (former employees, law enforcement, state licensing agents, etc.). The witnesses testified to the following facts. Many patients didn't pay for their own prescriptions, appointments, or travel to Smithers' office. J.A. 250–51, 293–94, 359–60, 389. Someone else did (usually a person named Darryl Williams or a person named Rick Jessie), and in exchange, the patients gave half or more of their pills to that person. J.A. 250–51, 359, 389. A number of Smithers' patients failed drug tests—they either tested positive for drugs they had not been prescribed or tested negative for drugs they had been prescribed, an indication that they were diverting those drugs for other purposes. J.A. 259, 450, 875, 879, 881–82, 883. Another patient failed a pill count, showing up with fewer pills than she should have had, given how frequently she was supposed to take them. J.A. 458. Despite those failed tests, Smithers continued to see them and continued to prescribe drugs to them. J.A. 262, 452–54. One of the patient witnesses had a prior conviction for selling prescription pills, but Smithers never drug tested her. J.A. 361. Another patient had been charged with drug trafficking and withholding information to obtain a controlled substance. J.A. 406. Smithers signed a form indicating he was aware of those charges yet continued prescribing to her. J.A. 406–07. Smithers also knew that another patient had been on Suboxone, a drug-addiction medication, in the past, but continued prescribing to her. J.A. 458.

4

All of the patients who testified had to drive many hours to reach the office. *See, e.g.*, J.A. 253 (six- to ten-hour round trip), 291–92 (eight- to ten-hour round trip). For one patient, it was a twelve- to thirteen-hour round trip. J.A. 327. After making it to the office, they often had to drive another hour or more to one of the few pharmacies that would fill their prescriptions. One patient had to go to a pharmacy five to six hours away from her home. J.A. 409.

Occasionally, Smithers sent patients prescriptions via mail without requiring them to come into the office. J.A. 256, 300, 399. But they still had to pay the full $300 office-visit fee. J.A. 399. When patients did come into the office, they would sometimes wait for eight to twelve hours. J.A. 541. Sometimes, Smithers wasn't even there. J.A. 324. According to an office employee, in a typical four-day week (the office was open only four days), Smithers was there only one or two days. J.A. 547. Patients would meet with him via Facetime from the office, *id.*, and they'd be given prescriptions from a pre-signed prescription pad. J.A. 532–33.

Smithers wrote prescriptions for one person, the ex-wife of Darryl Williams (one of the men who paid for patients' visits in exchange for pills), without ever seeing her. J.A. 342–47. Though the prescriptions were written in that woman's name, she never received them, J.A. 344, 347; they were instead sent to Williams' house.

At trial, the government introduced hundreds of pages of texts between Williams and Smithers. *See* J.A. 2099–2423. Williams, who was not employed by the clinic, essentially acted as Smithers' unofficial assistant. *Id.* He booked appointments for patients, coordinated carpools for them, ensured patients showed up for their appointments,

5

told Smithers when patients were coming, followed up with no-shows, and paid upfront for patients who didn't do so themselves. *Id.*[1]

At some point, Smithers became concerned that he couldn't trust Williams anymore. The government introduced three Post-It notes that it said came from a search of Smithers' office. J.A. 564–66. One of them read: "Is Darryl Williams wearing a wire?" *Id.* The others read: "For suspected wires: WO verification of your issues, I cannot help you," and "DEA?". *Id.* A receptionist at Smithers' clinic testified that he'd never seen the notes but recognized Smithers' handwriting. J.A. 563.

One of the government's expert witnesses, Dr. Deeni Bassam, a board-certified physician in pain medicine and management, testified that he was struck by how scant Smithers' medical files were. J.A. 834. Bassam said the pain questionnaires in patients' files captured only self-reported symptoms and were therefore insufficient to reach a diagnosis and recommend an appropriate treatment plan. J.A. 840. Bassam also said that the prescribed doses were high. J.A. 845–46. He noted that pain inventory forms were frequently left blank. J.A. 853. In one case, Smithers only asked for the patient's full treatment record eight months into prescribing the patient high doses of narcotics. J.A. 853–54.

Bassam testified in depth about two patients. But after the government finished its questioning regarding the second patient, the district court nudged the lawyer to move things along. J.A. 873. "[L]et me just discuss with you a little bit about how we're going

---

[1] Williams told Smithers that Williams was fronting the money, *i.e.*, that the patients would pay him back. But based on patients' testimony, Williams may never have intended for certain patients—those whose pills he was taking a cut of—to pay him back.

6

about this. We've got 2 of 50." *Id.* The lawyer took the hint. "I don't intend to go at the same pace with the other ones," he said. "I thought it was important to show what's in these files. Then I intended to ask him: During your review of the other files, would you find similar things or those characteristic of that? Then I intended to point out certain things in those other files." *Id.* The court approved that plan. *Id.*

The government made good on its word, speeding through the files of 22 patients in 70 minutes. J.A. 873, 910 (court resumed at 10:57 and recessed at 12:07). At the end of the direct examination, the government asked Bassam, "Just in recap . . . you reviewed every one of those prescriptions and in your opinion every one of those was issued outside the scope of professional practice and not for legitimate medical purpose [sic]; is that correct?" J.A. 910. Bassam said yes. *Id.* But this wasn't exactly true. Though he said he'd reviewed the files of all the patients whose prescriptions had been charged as unlawful prescribing (50 patients in total), J.A. 836–37, he later said he'd reviewed *almost* all 50, J.A. 836.

The government's other expert, Dr. Stacey Hail, testified about the cause of death of one of Smithers' patients, Heather Hartshorn. J.A. 767–820. Counts 298 and 299 charged Smithers with unlawful distribution of Oxycodone and Oxymorphone to Hartshorn. J.A. 1274. Hartshorn died two days after filling those prescriptions. J.A. 792, 979. On the jury verdict form, the jury was instructed that if they found Smithers guilty on Counts 298 and 299, they then had to decide whether those prescriptions resulted in Hartshorn's death. J.A. 1299. The jury found that they did. *Id.*

Hail testified that based on her expertise, as well as a review of Heather Hartshorn's medical file and autopsy report, the medical examiner's toxicology report, the police report, and

the Prescription Monitoring Program database, Hartshorn would not have died but for the prescriptions Smithers wrote her. J.A. 795–97. The authors of the documents did not testify.

On cross-examination, Hail provided details from the toxicology report and the medical records. J.A. 797–804. She said the toxicology report showed that Hartshorn had other drugs—not prescribed by Smithers—in her system at the time of her death. J.A. 799–803. Those drugs are contraindicated with opioids, she said. *Id.* She also said that Hartshorn's medical file showed she'd reported suicidal ideation to her mother shortly before she died. J.A. 804.

At the close of the government's case, the defense made an oral motion for a judgment of acquittal for insufficient evidence. J.A. 927–28. The court took the motion under advisement as to Count 1 (possession with intent to distribute) and denied the motion as to the other counts. J.A. 935–36.

### B.

The defense presented four witnesses—two patients, one pharmacist, and Smithers himself. Brenda Fisher, one of his patients, testified that she suffered from degenerative bone disease, a bulging disk in her back, and a right knee that needed to be replaced. J.A. 942. At the time she saw Smithers, doctors would not conduct knee surgery because she was on cancer medicine. *Id.* She lost the use of her legs when she was in a car accident at 17 and has suffered from back pain since. *Id.* When she first saw Smithers, he spent more than two hours with her, conducting a physical examination, taking vitals, and discussing her symptoms. J.A. 941. Throughout his care of Fisher, Smithers spoke to her about alternatives to medication, including probiotics, acupuncture, yoga, and more physical

activity. J.A. 966–67. When Smithers first started seeing Fisher, he told her he would continue prescribing her Roxicodone/Oxycodone 30 mgs for a couple months but wanted to wean her off them because he thought they were too strong. J.A. 943. Though he decreased the dosage to 20 mgs, he never took her off them altogether. J.A. 947.

Another Smithers patient, Lennie Hartshorn (Heather Hartshorn's father), had "disks messed up" in his neck and back, had had four disks fused, his right hip replaced, and his right knee replaced. J.A. 972. He'd worked 24 years in a coal mine, where he'd had multiple accidents. J.A. 973. Smithers talked with him about alternative treatments, like physical therapy and surgeries. J.A. 979. But Hartshorn was trying to avoid surgery—he'd had surgeries in the past that didn't go well. *Id.*

Hartshorn said the medication Smithers prescribed made his pain tolerable. Instead of simply lying in a recliner, unable to get out of it, he was able to "do a few things on the farm, be able to enjoy life some." J.A. 976. He owned a convenience store, and the medication allowed him to "tinker around in that." *Id.*

Finally, Smithers testified in his own defense. Smithers operated two pain clinics in West Virginia before opening up the one at issue here, located in Martinsville, Virginia. J.A. 1208, 1213, 1216. Both of those clinics had been shut down by authorities or preemptively shut down by Smithers once authorities came to inspect. J.A. 1216–21. When Smithers opened his Virginia clinic, some of his West Virginia patients followed him. They told him that they were facing a six-month to one-year wait list to see a chronic-pain doctor or a primary-care doctor who would treat chronic pain. J.A. 1058. Smithers referred to these people as "chronic pain refugees." J.A. 1166.

9

Smithers offered an explanation for every suspicious behavior—why his patient forms didn't indicate which pharmacy would fill their prescriptions, why he didn't order MRIs when they were needed, why he didn't take insurance, why he had an extremely unusual payment set-up with Darryl Williams, why he FedExed prescriptions to patients, and why he had a pre-signed prescription pad in the office. He also testified about individual patients. J.A. 1096–1129. He said he believed that the prescriptions he'd written for each patient were for a legitimate medical purpose. J.A. 1150.

At the end of the defense's case, Smithers renewed his motion for a judgment of acquittal. J.A. 1260A. The court again took it under advisement for count one and denied it as to the other counts. *Id.*

### III.

Before closing arguments, the court and parties discussed jury instructions. The parties' disagreement focused on the third element of the unlawful-prescribing counts, which defines "unauthorized." J.A. 993–95. The government asked that the element be phrased in the disjunctive: prescribed "without a legitimate medical purpose or beyond the bounds of medical practice." J.A. 993. Smithers asked for conjunctive phrasing: "without a legitimate medical purpose and beyond the bounds of medical practice." J.A. 994. The court adopted the government's disjunctive phrasing. J.A. 993, 1260S, 1260X, 1260Z.

The jury convicted Smithers on all counts. Smithers filed a written motion for acquittal or, in the alternative, a new trial. J.A. 1300. In a written opinion, the district court granted the motion for acquittal as to the possession-with-intent-to-distribute count and

10

denied it on all other counts.  J.A. 1304.  The court sentenced Smithers to 240 months for maintaining a place for the purpose of unlawfully distributing controlled substances, as well as 240 months on 855 of the 857 unlawful dispensing or distributing counts, to run concurrently.  JA 1320YYY.  On the two unlawful dispensing or distributing counts that the jury found resulted in Heather Hartshorn's death, the court sentenced Smithers to 480 months, to run concurrent with the 240 months.  J.A. 1320YYY.[2]

In 2020, Smithers appealed the district court's denial in part.  He argued that the jury instructions misstated the law and the error was not harmless, there was insufficient evidence to convict him, Hail's testimony violated his Confrontation Clause rights, and the district court abused its discretion in denying Smithers' motion for leave for counsel to withdraw.  In October 2021, oral argument was calendared for December.  But in early November, the Supreme Court granted certiorari in *Kahn v. United States*, No. 21-5261. *Kahn* asked whether jury instructions that presented the unlawful-dispensing charge in the disjunctive ("acted without a legitimate medical purpose *or* beyond the bounds of medical practice" (emphasis added)), as opposed to the conjunctive, were proper.  On the government's recommendation, and despite Smithers' opposition, we placed this case in abeyance until *Kahn* was decided.

---

[2] The Probation Office's draft presentence investigation report did not calculate the statutory or Guidelines range for a conviction on unlawful dispensing or distribution resulting in death, so the report landed on a guideline range of 360 months to life, with no mandatory minimum.  J.A. 2875.  In fact, as the corrected PSR noted, there is a 20-year mandatory minimum for unlawful dispensing/distributing of schedule I or II controlled substances that results in death.  J.A. 2922 (citing 21 U.S.C. § 841(b)(1)(C)).  Including those counts in the calculation leads to a Guidelines recommendation of life.  J.A. 2922.

*Kahn* was decided under the consolidated case name *Ruan v. United States*, 597 U.S. 450 (2022). *Ruan* did not directly address the disjunctive versus conjunctive issue. It addressed the *mens rea* required for unlawful distribution of a controlled substance. As explained above, under 21 U.S.C. § 841(a)(1), "[e]xcept as authorized . . . , it [is] unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." A prescription is only authorized when issued "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04. *Ruan* held that the statute's "knowingly or intentionally" *mens rea* applies to "except as authorized." *Ruan*, 597 U.S. at 454–55. After *Ruan* was decided, this Court requested supplemental briefing from the parties on whether and how *Ruan* affected the case.

## IV.

### A.

We review de novo whether jury instructions incorrectly stated the law. *United States v. Washington*, 743 F.3d 938, 941 (4th Cir. 2014). If they did, we decide under either harmless error or plain error whether the conviction must be set aside. *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022). A preserved objection is analyzed under harmless error; a waived or forfeited objection is analyzed under plain error. *Id.*

Smithers initially challenged the jury instructions for being improperly phrased in the disjunctive. After this Court asked for supplemental briefing post-*Ruan*, he also argued (more directly, at least) that the instructions improperly stated an objective *mens rea*

12

standard.  The parties disagree about whether Smithers waived his *mens rea* argument, so necessarily disagree about the appropriate standard.  We begin with waiver.  We then discuss whether the jury instructions, as a whole, misstated the law.  Finally, we discuss whether any error in the instructions was harmless.

B.

We begin with the waiver issue.  The government first argues that Smithers waived his argument that the jury instructions improperly stated an objective *mens rea* requirement because he "failed to alert the district court to the supposed scienter error at the most obvious time to do so—in formulating the elements."  Supp. Resp. Br. at 38.  According to the government, because Smithers challenged "only the good-faith instruction below [and] not the formulation of the elements," he waived the issue.  *Id.*  But the good-faith instruction simply provided a more detailed explanation of the meaning of the third element.  Indeed, the unlawful-distribution elements and the good-faith explanation came in the same instruction, Instruction No. 20.  And in any event, the crux of Smithers' good-faith objection was that the instruction allowed the jury to convict based solely on an objective *mens rea*.  J.A. 9579–80 ("for the Court to instruct that this is an objective and not a subjective test goes to the *mens rea* element of it").  This is the very scienter argument the government now says Smithers didn't make below.  Smithers therefore preserved his arguments in the district court.

The government says Smithers nevertheless still waived his scienter argument by not raising it in his opening brief before this Court.  Supp. Resp. Br. at 18.  This misunderstands the relationship between § 841's scienter requirement and whether § 841

13

is phrased disjunctively or conjunctively.  By raising the disjunctive/conjunctive issue in his opening brief to this Court, Smithers necessarily raised the scienter argument.

Again, a prescription is authorized only if it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04.  The district court instructed that Smithers could be convicted if he issued a prescription that was not for a legitimate medical purpose *or* acted beyond the bounds of medical practice in issuing the prescription.  J.A. 1260X, Z.

As Smithers notes, acting without a legitimate "medical purpose" incorporates some subjective *mens rea* (whether it rises to the level of knowledge is another question).  But acting outside the "bounds of medical practice" is a purely objective standard.  Supp. Opening Br. at 8.  Because the instructions were phrased in the disjunctive, they allowed the jury to convict solely based on a finding that Smithers acted outside the bounds of medical practice.  That is, the jury was allowed to conclude that by acting outside the bounds of medical practice, Smithers acted in an unauthorized manner.  Smithers' argument in his original opening brief that the instruction should have been phrased conjunctively was an attempt to import the subjective *mens rea* from "legitimate medical purpose" into "acting outside the bounds of medical practice," and thus keep the jury from convicting based only on an objective standard.  True, Smithers didn't need conjunctive phrasing to add a subjective *mens rea*.  He could have instead argued for an instruction that read, "knowingly acting without a legitimate medical purpose or knowingly acting outside the bounds of professional practice."  But he didn't.  And the fact that he *could* have disentangled the objective-test argument from the conjunctive-phrasing argument doesn't

14

mean that the issues are distinct enough for us to find that he waived one. Asking the court for conjunctive phrasing, then, was the same as asking for an intent requirement, and Smithers didn't waive the scienter issue.

Even if Smithers had not appealed the scienter issue, though, he wouldn't be precluded from presenting it in supplemental briefing. When Smithers filed his opening brief, it would have been futile for him to argue for a subjective standard. In *United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006), this Court said that whether a practitioner has acted without a legitimate medical purpose or outside the bounds of professional conduct is judged objectively. There, the district court used a good-faith instruction to help the jury decide whether the defendant acted outside the bounds of professional conduct. *Id.* at 476–78. The defendant proposed instructions stating that "good faith" is a subjective standard. *Id.* at 478. The district court rejected the instructions, and this Court affirmed. We said that "good faith" is an objective standard as applied to "acting outside the bounds of accepted medical practice." *Id.* at 479–81. In other words, "acting outside the bounds of accepted medical practice" is judged objectively. *See id.* We based that conclusion on *United States v. Moore*, 423 U.S. 122 (1975), which, we said, "strongly suggest[ed] the inquiry [under § 841, for prosecutions of medical practitioners] is an objective one." *Hurwitz*, 459 F.3d at 478.

Despite *Hurwitz*, Smithers objected at trial to the district court's good-faith instruction. S.A. 9579–80. The district court overruled Smithers' objection. S.A. 9580. Smithers did not appeal that specific issue. (Though, as explained above, by appealing the disjunctive/conjunctive issue, he necessarily appealed the *mens rea* issue.) But that's of no

15

consequence to him. "[W]hen an intervening decision of this Court or the Supreme Court affects precedent relevant to a case pending on direct appeal, an appellant may timely raise a new argument, case theory, or claim based on that decision while his appeal is pending without triggering the abandonment rule." *United States v. White*, 836 F.3d 437, 443–44 (4th Cir. 2016), *abrogated on other grounds by United States v. Stitt*, 586 U.S. ----, ----, 139 S. Ct. 399, 404 (2018); *see also Joseph v. United States*, 574 U.S. 1038 (2014), *respecting denial of certiorari* (Kagan, J.) (noting that every circuit but the Eleventh [which has since changed its rule] says an appellant preserves an issue, despite not presenting it in his opening brief, when change in precedent makes the previously foreclosed argument available); *id.* (citing *United States v. Musleh*, 106 F. App'x 850, n.4 (2004)).

The government doesn't cite any of these cases and instead relies on an inapposite case. In *United States v. Boyd*, the defendant objected in the district court to a career-offender enhancement. 55 F.4th 272, 275 (4th Cir. 2022). He argued at sentencing that because the predicate offense of assault with intent to kill required only a recklessness *mens rea*, it was not a crime of violence. *Id.* And in fact, the Fourth Circuit had held nine months before Boyd's sentencing that a recklessness *mens rea* is insufficient to establish a crime of violence. *Compare United States v. Middleton*, 883 F.3d 485, 497 (4th Cir. 2018) (published Feb. 26, 2018), *with* 3:16-cr-00251-TLW-1, Dkt. 84 (sentencing hearing held on Nov. 13, 2018). Despite that, the district court overruled Boyd's career-offender objection. *Boyd*, 55 F.4th at 275–76. Boyd appealed the district court's sentence, but on other grounds. After he filed his opening brief, the Supreme Court held that, as the Fourth

16

Circuit had previously stated, a recklessness *mens rea* isn't enough for a crime of violence. *United States v. Borden*, 593 U.S. ----, ----, 141 S. Ct. 1817, 1821–22 (2021).

This Court held that he waived his argument because the Supreme Court's ruling *affirmed* Fourth Circuit caselaw that was available to Boyd when he filed his opening brief. *Boyd*, 55 F. 4th at 279–80.  That is not the case here.  Because the objective *mens rea* argument was unavailable to Smithers when he filed his opening brief, he did not waive the issue.

C.

That brings us to whether the instructions misstated the law post-*Ruan*.  We hold that they did and that other jury instructions did not cure the error.

Smithers objected to Instructions 15, 19, and 20, all of which use the phrase "without a legitimate medical purpose or beyond the bounds of medical practice."  1260S, X, Z–BB. Instruction No. 15 summarizes the three types of charges across all the counts, No. 19 summarizes the three elements that the government must prove for the unlawful-distribution counts, and No. 20 explains in detail the third element of unlawful distribution ("acted without a legitimate medical purpose or beyond the bounds of medical practice").[3]

Smithers says these instructions (1) failed to state that Smithers could only be convicted if he *knew* that his conduct was unauthorized and (2) created a strict liability offense by phrasing the *mens rea* requirements in the disjunctive.

The government argues that even if the instruction that Smithers challenges misstated the law, three other instructions corrected the error:  the willful-blindness

---

[3] Instruction No. 20 also contains the good-faith instruction that the government says cures any error in the other instructions.

17

instruction in No. 24, the aiding-and-abetting instruction in No. 23, and the good-faith instruction in No. 20. Supp. Resp. Br. at 22–32.

We address each of those instructions in turn, recognizing that jury instructions are evaluated holistically and reviewed for abuse of discretion. *Burgess v. Goldstein*, 997 F.3d 541, 557 (4th Cir. 2021). The key issue is "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011).

i.

We begin with the willful-blindness instruction, No. 24. It read:

> You may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant believed there was a high probability that patients were abusing the drugs prescribed and that he took deliberate actions to avoid learning of that fact. Knowledge may be inferred if the defendant deliberately closed his eyes to what would otherwise have been obvious to him. A willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. You may not find the defendant acted "knowingly" if you find he was merely careless or mistaken as to those facts.

J.A. 1260GG.

The government argues that this instruction was "squarely directed at proof beyond a reasonable doubt that Smithers knew (by way of deliberately avoiding his patients' obvious drug abuse) that his prescriptions were not for a legitimate medical purpose or were beyond the bounds of the medical practice." Supp. Resp. Br. at 23. This argument would only work if Instruction No. 20 (explaining the meaning of "without a legitimate medical purpose or beyond the bounds of medical practice") required a finding that Smithers *knowingly* acted

18

outside the course of professional practice. Had it required that finding, the willful-blindness instruction would have instructed the jury that they could find the requisite *mens rea* for acting "beyond the bounds of medical practice" without a showing of actual knowledge. But Instruction No. 20 didn't require any knowledge to begin with, so instructing the jury that they could find knowledge from willful blindness wasn't relevant to them finding that Smithers acted outside the course of professional practice.

ii.

The aiding-and-abetting instructions informed the jury that they could convict Smithers if the government proved that he "knowingly and deliberately associated himself in some way with the crime charged and participated in it with the intent to commit the crime." J.A. 1260EE. The instructions also said that the government had to prove the defendant:

> (1) Knew that the crimes charged were to be committed or were being committed, (2) Knowingly did some act for the purpose of aiding or encouraging the commission of that crime, and (3) Acted with the intention of causing the crimes charged to be committed.

J.A. 1260EE.

The government argues that the knowing standard in these instructions makes up for any error elsewhere. Supp. Resp. Br. at 13–16. This argument assumes that the jury convicted Smithers as an aider and abettor, as opposed to a principal. If they convicted him as a principal, nothing from the aiding-and-abetting instructions could have cured that verdict. And in fact, it is much more likely that the jury convicted him as a principal. Nothing in the government's case or opening or closing arguments suggested aiding-and-

19

abetting liability. Smithers was presented as the ring master of the whole operation. The aiding-and-abetting instructions cannot cure the fundamental *mens rea* error.

iii.

Nor can the good-faith instruction. That instruction read:

> A doctor's good faith in medically treating a patient is relevant in determining whether the doctor has dispensed a drug for a legitimate medical purpose in the usual course of medical practice. The burden of proof is not on the defendant to prove his good faith, of course, since he has no burden to prove anything. "Good faith" means that the physician acted with good intentions in the honest belief that he was attempting to act in accord with the standards of medical practice generally recognized and accepted in the medical profession. This is an objective test, and not a subjective one. In other words, a physician cannot substitute his own views of what is good medical practice in place of generally accepted norms simply because he believes it proper. If you find that the defendant acted in good faith as I have defined it in prescribing the drugs charged in this case, then you must find the defendant not guilty.

J.A. 1260Z–BB.

The idea that this instruction made up for other deficiencies is a nonstarter. The district court in *Ruan* also gave "good faith" instructions, and the Supreme Court explicitly rejected reliance on that standard. 597 U.S. at 456, 465–66. It noted that words like "good faith," "objectively," "reasonable," or "honest effort" appear nowhere in the statute and would "turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable' doctor, rather than on the mental state of the defendant himself or herself." *Id.* at 465.

The government argues that the admittedly "inapt" "objective" reference was simply supposed to convey that generally accepted medical standards don't change depending on what a defendant believes them to be. Supp. Resp. Br. at 29–31. That is true

as a matter of law, *see Ruan*, 597 U.S. at 467, but it's not a fair characterization of what the instructions said. "This is an objective test" clearly referred to the entirety of the preceding sentence, which defined "good faith." In other words: "[good faith] is an objective test." That instruction directly contravenes *Ruan*; far from helping the government, it proves Defendant's point.

iv.

Finally, at oral argument, the government argued that the conviction on Count 2 could stand by itself even if the convictions on all other counts were vacated. Oral Arg. at 3:15:50–3:16:30; 3:28:22–3:29:30. Count 2 charged Smithers with knowingly and intentionally maintaining a place for the purpose of unlawfully distributing controlled substances. J.A. 102. According to the government, "for the purpose of" provides at least a knowing *mens rea*, so the *Ruan* problem in the jury instructions for Counts 3–862[4] is not present in the Count 2 instruction. Under the government's argument, the Count 2 instruction effectively told the jury that convicting on that count required the government to prove that Smithers "knowingly and intentionally maintained the stated premises for the purpose of . . . distributing controlled substances [without a legitimate medical purpose or beyond the bounds of medical practice]."

---

[4] Because the government moved to dismiss Count 101 before trial, J.A. 215LL–MM, the unlawful-distribution counts are actually Counts 3–100 and 102–862. For simplicity's sake, we refer to them as Counts 3–862 throughout this discussion.

Even if this iteration of the instruction, read in isolation, were an accurate statement of the law, it would not allow the Count 2 conviction to stand by itself.[5]  That's because jury instructions are not evaluated in "isolated segments," but instead analyzed "as a whole." *United States v. Cropp*, 127 F.3d 354, 360 (4th Cir. 1997); *see also United States v. Morrison*, 991 F.2d 112, 116 (4th Cir. 1993); *United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996).  "[A] judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge.  Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction."  *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).

Reading Count 2 in conjunction with the 859 unlawful-distribution counts, we find it impossible to believe that the jury interpreted Count 2 as requiring a subjective *mens rea* while simultaneously and correctly interpreting the 859 predicates[6] of Count 2 as requiring only an objective *mens rea*.  The most obvious explanation, rooted in the understanding that juries read instructions as a whole, is that once the jury convicted Smithers on the

---

[5] We do not reach whether this instruction by itself is an accurate statement of the law because doing so would require us to decide whether it was proper to phrase the instructions in the disjunctive.  Although Smithers raised that issue in his pre-*Ruan* briefing—and, in doing so, raised the scienter issue that *Ruan* ultimately addressed—the totality-of-the-instructions doctrine is enough to resolve this case.

[6] We understand that the unlawful-distribution counts were not actual predicates.  But the government's theory of Count 2 was that Smithers maintained the clinic for the purpose of committing Counts 3–862.

unlawful-distribution counts, a conviction on the maintaining-a-place count was inevitable. So if the jury convicted Smithers solely for acting outside the bounds of professional conduct, it didn't matter that Count 2 required a higher *mens rea*. Four words ("for the purpose of") cannot sustain the Count 2 conviction when that conviction was based on an avalanche of counts on which the jury was improperly instructed. The Count 2 jury instructions, read in conjunction with the other instructions, were improper.

## D.

We next decide whether the error in the instructions was harmless. To determine whether jury-instruction errors that were contested below were harmless, we ask whether the "record contains evidence that could rationally lead to a contrary finding with respect to that omitted element." *Brown*, 202 F.3d at 701 (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)). If "there is evidence upon which a jury could have reached a contrary finding, the error is not harmless . . . because . . . we cannot determine beyond a reasonable doubt that the 'jury verdict would have been the same absent the error.'" *Id.* (quoting *Neder*, 527 U.S. at 19).

For each patient about whom the government actually presented evidence, Smithers spoke about their medical records, their complaints, and what incidents led to their pain. Almost all of them had had significant accidents, often car or workplace accidents. Smithers testified that he believed there was a legitimate medical purpose for each of the prescriptions. True, much of the testimony wasn't particularly convincing, as weighed against the prosecution's evidence. And a jury might very well not have believed Smithers' testimony that he was acting with a legitimate medical purpose. But copious evidence of a defendant's

23

guilt does not necessarily make an instructional error harmless. *See Connecticut v. Johnson*, 460 U.S. 73, 83 (1983) (discussing *Carpenters & Joiners v. United States*, 330 U.S. 395 (1947)). The defense provided evidence that could rationally have led to a contrary finding on each of the unlawful-distribution counts. And because, as explained above, the conviction on Count 2 effectively rested on the unlawful-distribution convictions, the error in the Count 2 instructions also wasn't harmless.

At oral argument, the government also argued that the conviction on Count 2 makes the jury-instruction error in Counts 3–862 harmless. Oral Arg. at 3:15:14–3:16:44; 3:17:12–3:18:59. When the jury convicted Smithers on Count 2, it found that he maintained a place for the purpose of unlawful distribution. Therefore, the government says, the jury necessarily found on Counts 3–862 that Smithers purposefully unlawfully distributed. And if they had been properly instructed on those counts, we know that they would still have convicted Smithers on them.

This argument assumes that the Count 2 instructions were proper in isolation, an issue we don't reach. *See supra*, at n.5. But even if that assumption were correct, the government's argument would be unconvincing. Contrary to what the government says, this is not an example of a necessary finding of harmlessness. Supp Resp. Br. at 39–40 (citing, *e.g.*, *United States v. Collins*, 982 F.3d 236 (4th Cir. 2020)). While one could conclude that a conviction on a properly instructed Count 2 meant the jury found purposeful intent on at least one of the unlawful-distribution charges, we have no way of knowing which. Maybe it was all 859 of the charges, but maybe not. Maybe it was the prescriptions for some patients and not others. And even then, we cannot know which

24

prescriptions—all fifty patients had multiple prescriptions, and each were charged separately. These wouldn't be necessary findings of harmlessness; they would be speculative. The standard for a finding of harmlessness is higher than that.

In sum, because there was evidence upon which a jury could have reached a contrary finding, the instructional errors were not harmless.

V.

Because the jury was improperly instructed and the instructions were not harmless, we vacate the convictions and remand to the district court for proceedings consistent with this opinion.

*VACATED AND REMANDED*